**AMERICAN PROPELLER & MFG. CO. v. UNITED STATES.**

No. B–28.

Court of Claims.

April 6, 1936.

This case having been heard by the Court of Claims, the court, upon the evidence adduced, makes the following special findings of fact:

1. Plaintiff was incorporated in 1915 and, during the times here involved, was a manufacturer of propellers for airplanes. Its business as such was founded upon certain patent rights in the construction and design of propellers for aircraft, assigned to it by the patentee, Spencer Heath, president of the company, who was a pioneer in the design and construction of airplane propellers.

Among the patentee's improvements was the construction of the two-bladed propeller with laminations divided at the hub and joined there by a long slanting joint. This enabled the inventor to match the blades one against the other, which was impossible with a continuous blade or lamination. This innovation in construction was a recognized improvement, superior to methods of construction involved in designs which the War Department was preparing at the inception of the contract periods herein involved.

2. On September 21, 1917, A. C. Downey, Captain, Signal Corps, United States Reserves, by direction of the Chief Signal Officer of the Army, gave plaintiff an order in writing, No. 20005, for "1,000 propellers, for Curtiss OX-5, engines, oak (to be tipped with copper and including box) as per specifications" (enumerating their serial numbers), at $87.65 each, total $87,650, deliveries to be 20 per day commencing September 10, 1917, contract No. 1750 to follow. This order was followed by a formal contract, by and between plaintiff and the said Downey, for and in behalf of the United States, September 25, 1917, numbered 1750, for the material described in order No. 20005 and at the price named therein. Copies of the contract and order are attached to the petition as Exhibit No. 1 thereto, and made part of this finding by reference.

The propellers required by this order and contract were of the "training" type.

Plaintiff delivered, directly to the government upon its direction 900 of these propellers, the last shipment, on March 20, 1918, and the 900 have been paid for. The balance of 100 were made and shipped at the appropriate stage of completion to the Copper Products Company, Boston, Mass., for copper tipping by the process of electrolysis, plaintiff having been directed to do so by defendant's officers for the purpose of testing the process in use at the Copper Products Company's plant, which they thought might be an improvement over plaintiff's method of copper tipping. The propellers so shipped to the Copper Products Company were held by that company some months, until 99 were returned to the plaintiff, and rejected by the government inspector solely on the ground that the work done by the Copper Products Company was unsatisfactory. These 99 propellers are still in the hands of plaintiff and have not been paid for. The remaining propeller was, by direction of defendant's officers, shipped by the Copper Products Company to the Curtiss Aeroplane Company for experimental purposes and plaintiff has not been paid therefor.

3. On October 4, 1917, Captain Downey, by direction of the Chief Signal Officer of the Army, again delivered to plaintiff an order in writing, No. 20054 for "1,000 propellers, oak, to be tipped with copper, including box, for Curtiss OX-5 engine," and "1,000 propellers, oak, to be tipped with copper, including box, for Hall-Scott, A-7-A engine," all 2,000 propellers at $87.65 each, total $175,300, to be in accordance with enumerated specification numbers, delivery to be at the rate of 125 per month beginning November 1, 1917, on each set, 250 per month on all. This order was followed by a formal contract October 6, 1917, No. 1846, covering the terms of the order, by and between plaintiff and Captain Downey for and in behalf of the United States. Copies of the order and contract are attached to the petition as Exhibit No. 2, and made part hereof by reference.

The propellers required by this order and contract were of the "training" type.

In the fulfillment of this order and contract plaintiff began using, with the approval of the War Department, pre-existing designs, Nos. 130 and 151, the design of the propeller being determined by the type of engine used. On February 8,

1918, plaintiff was instructed by the Department to substitute design No. 8–25, which was a government design, on the propellers for the Hall-Scott A–7–A engine. February 12, 1918, this order was countermanded. On March 28, 1918, by wire, confirmed the following day by letter, the Department ordered the use of design 13706 on Hall-Scott A–7–A engines, and asked for the number of propellers that plaintiff would have to complete under the old design. The propellers in process under the old design could not in practice be altered to conform to the new design.

May 9, 1918, plaintiff was by telegram instructed by the Signal Office, War Department, to "cancel all incomplete shipping instructions on order twenty thousand fifty-four except instructions seventh covering twelve OX fives Langley."

May 13, 1918, E. T. Farley, First Lieutenant, A. S., Sig. R. C., by direction of the Chief Signal Officer of the Army, wrote to plaintiff as follows:

"1. With reference to Signal Corps Order No. 20054, you are advised that all uncompleted shipping instructions are hereby cancelled, with the following exception: Instructions issued under date of May 7, 1918, covering twelve propellers of the OX–5 type to Langley Field, Hampton, Va.

"2. It is requested that you immediately furnish this office with a list showing all propellers shipped, giving consignees, dates of shipments, and quantities shipped, together with the unshipped balances."

At or about this time defendant's officers instructed plaintiff to suspend operations on all training propellers for four months as the output was exceeding their requirements.

On order No. 20054, contract No. 1846, plaintiff delivered to defendant 906 propellers. Of the 906 propellers delivered 820 were accepted and paid for by the defendant. Plaintiff endeavored to obtain shipping instructions for the balance of 1,094 propellers under this contract, and shipping instructions were refused by the defendant's officers. The balance of 1,094 have not been paid for. Shipping instructions were refused because airplanes for training purposes were not being manufactured rapidly enough to absorb the output of training propellers and training propellers were being accumulated faster than they could be used. The balance of 1,094 propellers are now on hand at plaintiff's plant.

4. In the fall of the year 1917, plaintiff's plant was located in Baltimore, Md., and was entirely in leased buildings. In or about September, 1917, plaintiff began the erection of a plant in Baltimore on the Key Highway. This plant will hereinafter be termed the Key Highway Plant.

In December, 1917, the Key Highway Plant was nearing completion. It consisted of one story with basement one-quarter of the area thereunder, the main floor area being 30,000 square feet. It was built of concrete with walls principally of glass, concrete pilasters being in between the sash, and the roof was provided with numerous openings for sky light. Its structure was such that it would support another story. Building a one-story factory building sufficiently strong to support additional stories was sound practice and not unusual.

5. Toward the last of December, 1917, and when the Key Highway Plant was structurally about completed, Edward L. Ryerson, Jr., Lieutenant, Signal Corps, head of the Propeller Section, Equipment Division, Office of the Chief Signal Officer, War Department, and charged with arrangements for the production and procurement of propellers for the Air Service, including negotiations for the procurement of lumber used in connection with the manufacture thereof, visited the Key Highway Plant for the purpose of informing himself as to plaintiff's facilities for the manufacture of propellers.

At Lt. Ryerson's request plaintiff's president, Spencer Heath, conducted him over the plant. Lieutenant Ryerson expressed himself as pleased with the general appearance of the place, but said that it was not of sufficient capacity to manufacture the number of propellers the War Department would order from the company, and inquired if another story could be added. Upon being told that it could and that the skylight openings could be closed up, making a satisfactory floor out of the roof, Lt. Ryerson urged Heath to make the addition, to devote the entire floor space of the two stories to operations and provide the necessary office space separately therefrom. After some argument, Heath, insisting that the company would have to be given sufficient government business to justify the additional space, and

Lt. Ryerson, insisting that such business would be forthcoming, promised Lt. Ryerson to make the addition and immediately arranged with the contractor who had already erected the basement and first floor to add another story, necessary elevators, and extra office space.

Plaintiff completed the erection of the Key Highway Plant, including the addition, in the summer of 1918, and moved into it about August 1, 1918.

While the additional construction was going on and until the work was well in progress Lt. Ryerson kept in frequent personal contact with Heath asking to be informed as to the state of the work.

6. The Key Highway Plant, as thus enlarged, required machinery and equipment in excess of that appropriate to the building as first constructed. This included elevators, a battery of upright boilers, additional kilns for the drying of lumber, and machinery in about twice the amount needed for a one-story building.

The original plant was equipped with eight masonry kilns of the box type, and when the floor space was doubled plaintiff installed eight additional kilns of curtain type on top of the other kilns. In order to dry the lumber furnished by the government, as hereinafter related, Lt. Ryerson, upon plaintiff's representation that it was necessary to make provision to dry the lumber then being shipped to it by the government, endeavored to procure additional kiln facilities outside plaintiff's premises. He was unable to do so and insisted upon plaintiff's adding to its facilities sufficient kilns to take care of the lumber that was then being delivered, or would be delivered, to plaintiff by the government for the manufacture of airplane propellers. Heath objected that his outlay was already considerable and that there was a limit beyond which he could not be expected to go. Lieutenant Ryerson continued to urge upon Heath the necessity of additional kiln facilities and told him that it would be necessary to provide adequate dry kiln capacity in order to dry kiln the lumber, that Cutler curtain kilns had been approved by the inspection department, and that he had better go ahead and provide them.

Plaintiff thereupon erected 12 Cutler curtain kilns adjacent to the other 16 kilns at the Key Highway Plant, under the direction of a kiln expert attached to the War Department, and they were operated at all times under this expert's control and direction.

7. February 8, 1918, Lt. Ryerson, by direction of the Chief Signal Officer, advised plaintiff by letter as follows:

"Subject: Mahogany.

"1. In connection with the supply of mahogany lumber we have arranged for the purchase of 152,000 feet of Central American mahogany from the Otis Manufacturing Company of New Orleans, material to be propeller stock 8" and up in width, not over 5% to be under 9" and 8' and up in length firsts, seconds, and selects, not more than 25% selects. This material is being bought by the Signal Corps at $270.00 per thousand, f. o. b. New Orleans, for material 8" to 17" in width and $300.00 per thousand, f. o. b. New Orleans, for material 17" in width and over.

"2. Material is ready for immediate delivery and I expect to wire instructions to load for delivery to your plant at Baltimore for use in production of additional combat propellers.

"3. It would be desirable to have this material purchased outright by you from the Signal Corps and make your quotations accordingly. We believe this material will be very desirable stock for the manufacture of propellers on account of the large percentage of wider widths.

"4. We have also purchased some 40,-000 feet of wide stock, 18" and up, from Lewis, Thompson & Company, New York City, at a price of $320.00 per thousand, f. o. b. Astoria, Long Island. We desire to apply this material as well on your orders.

"5. Kindly advise us at once as to your suggestions for handling this matter, incorporating your order for the material, if same is in full accord with your understanding as to the best method of handling the matter."

At the time this letter was written and theretofore plaintiff had provided itself with lumber necessary for its pending orders from the open market, and had no contracts or orders from the government upon which the mahogany lumber referred to could be applied. The mahogany lumber therein mentioned referred solely to orders or contracts for propellers which the War Department intended to give the plaintiff. In 1918 and up to the time of the Armistice, mahogany and walnut lum-

ber were under control of the government. February 15, 1918, plaintiff was advised by wire as follows: "Do not negotiate for purchase of walnut propeller stock. Signal Corps buying all walnut and will take care of all your requirements. Signal Equipment Thirty One." At the time this telegram was transmitted plaintiff had no orders or contracts from the Signal Corps requiring the use of walnut lumber, and the telegram referred solely to future orders or contracts for propellers which the War Department contemplated giving the plaintiff.

Thereafter from time to time the War Department caused to be delivered to plaintiff shipments of walnut and mahogany lumber. June 4, 1918, the Signal Corps in writing required plaintiff to have on hand at all times 150,000 to 200,000 feet of black walnut lumber, to be used on rush orders for propellers from the Signal Corps. All lumber furnished by the Signal Corps came to plaintiff in a green state, requiring from 30 to 60 days to dry out in plaintiff's kilns before it could be manipulated.

Up to June 14, 1918, defendant had caused to be delivered to plaintiff for the manufacture of airplane propellers 774,000 feet of walnut and mahogany lumber without prior requisition therefor from plaintiff. This lumber was not needed for contracts existing at the time of delivery. All other deliveries of lumber by the government were on requisitions by the plaintiff. The prices of said 774,000 feet and all requisitioned lumber were determined by the government and not by plaintiff.

The government at no time made deliveries to plaintiff of oak lumber.

8. Following negotiations in January 1918, F. D. Schnacke, First Lieutenant, Sig., R. C. A. S., by direction of the Chief Signal Officer of the Army, gave plaintiff, February 11, 1918, a written order, No. 30619, for 60 propellers for U. S. 12 engines, as per specifications, of mahogany or walnut, at $184 each, total $11,040, including box, 30 to be ready for delivery January 31, 1918, the remainder February 15, 1918. This was followed by a formal contract, No. 2907, February 15, 1918, embodying the order, by and between plaintiff and Lt. Schnacke for and in behalf of the United States.

These propellers were delivered and paid for. They were of the type known as "combat" propellers. The material

therefor was procured by plaintiff in the open market.

9. In the latter part of February, 1918, Lt. Ryerson gave plaintiff a verbal order for 750 combat propellers of plaintiff's design, to be made from plaintiff's stock, and delivered in March 1918. A few days thereafter Lt. Ryerson verbally increased the order to 1,000 propellers. March 13, 1918, he instructed plaintiff by wire to discontinue work on this order and asked if it could substitute at once Hispano propellers, to be of oak, no copper tips, in accordance with drawing then being sent to plaintiff, and what was the earliest date delivery could commence. March 14, 1918, Lt. Ryerson, by direction of the Chief Signal Officer, confirmed the order for 750 combat propellers by letter as follows:

"1. We find that we have never confirmed our understanding with you that you were to proceed with the gluing up of blocks for use on combat propellers as per arrangements made with Lieutenant Ryerson.

"2. This agreement incorporated the use of wideners and splices where necessary in the construction of these blocks for combat propellers. It was understood that mahogany or oak would be used, mahogany being given the preference and used as far as possible with the stock available.

"3. The arrangement was made with the understanding that you were to produce 750 combat propellers in March, provided final information with regard to pitch and design could be obtained in sufficient time to permit the finishing of these blocks within the time specified.

"4. It was originally understood that these blocks would be built up so as to be finished in accordance with your own dynopter type design as per sample being sent to Dayton for tests. It was later agreed that the blocks would be so changed as to permit the finishing of propellers up to 10′ diameter and with pitch and other dimensions to be determined by later tests, provided such dimensions could be applied in the construction of these blocks.

"5. You will furnish us, upon receipt of this, an accurate statement of the status of this matter, indicating the number of blocks in process, the number that can be applied on 10′ diameter blades as well as the number that must be applied on blades of the dynopter type design.

"6. It is understood that this procedure was adopted as an emergency measure, in order to make possible the production of combat propellers with as great rapidity as possible in spite of the fact that no approved design could be furnished for the execution of a contract in a regular manner.

"7. It was understood that as soon as tests could be made to determine the proper pitch and design that could be applied on these blocks that negotiations would be entered into for the purchase of a number of completed propellers represented by the blocks which you have constructed for this purpose."

There was no confirmation of the verbal increase to 1,000 propellers.

On March 13, 1918, plaintiff had in process some 400 of the 750 propellers so ordered, of which 184 (hereinafter referred to) were in the last stages of completion, 172 thereof being glued and 12 not glued, the balance of the material being thereafter diverted to other work. The lumber used in their construction was of quartered white oak.

Plaintiff discontinued work on the combat propellers as instructed in the telegram of March 13, 1918, and has not been paid by the defendant for any of the labor or material used in the performance of the foregoing order.

The 184 propellers brought to the last stages of completion are still in storage at plaintiff's plant and have not been paid for.

10. On March 22, 1918, Lt. Schnacke, by direction of the Chief Signal Officer of the Army, gave plaintiff an order in writing, No. 20858, for 300 propellers for Hispano Suiza engines, in accordance with specifications, to be made of quartered white oak, birch or cherry, at $110 each, without copper tips, but with individual boxes for shipment, total $33,000, delivery to begin immediately, to be completed on or before April 15, 1918. Contract No. 3348, dated March 25, 1918, embodying this order, followed, by and between plaintiff and Lt. Schnacke for and in behalf of the United States.

These propellers were known as "training" propellers.

The order was given to plaintiff on representations by defendant's officer that it was an emergency order and would have to take precedence over all other work.

Plaintiff gave it precedence and completed delivery of the propellers on or about April 15, 1918, and received the contract price therefor.

11. On March 22, 1918, Lt. Schnacke, by direction of the Chief Signal Officer of the Army, placed with plaintiff a written order, No. 20859, for 100 propellers, oak copper tipped, for Curtiss, V–2, type 3, on R–4 airplanes, at $127 each, total $12,700, to be in accordance with Signal Corps specifications, delivery to begin April 1, 1918, and the entire order to be completed by May 1, 1918. This was followed March 25, 1918, by a formal contract, No. 3347, embodying the previous order, by and between plaintiff and the said Lt. Schnacke for and in behalf of the United States. Copies of this order and contract are attached to the petition as Exhibit No. 3, and are made part hereof by reference.

These propellers were of the "training" type. Of the number contracted for, 90 were delivered, accepted and paid for.

12. On March 23, 1918, Lt. Schnacke, by direction of the Chief Signal Officer of the Army, gave plaintiff a written order, No. 20860, for 500 propellers for Curtiss OX–5 engines, to be of oak and copper tipped and in accordance with Signal Corps specifications, at $76 each, total $38,000, to be ready for inspection six weeks after receipt of order. This was followed by a formal contract March 25, 1918, No. 3349, embodying the previous order, by and between plaintiff and Lt. Schnacke for and in behalf of the United States. Copies of the order and contract are attached to the petition as Exhibit No. 4 and made part hereof by reference.

These propellers were of the "training" type. Of the number contracted for, 379 were delivered.

13. May 14, 1918, Lt. Schnacke, by direction of the Chief Signal Officer of the Army, placed with plaintiff a written order No. 21128 for 3,000 propellers for U. S. 12 engines, without tips, of walnut, in accordance with Signal Corps specifications and the Charavay design, at $100 each, total $300,000. Deliveries were to begin June 15, 1918, and continue at the rate of 40 propellers a day, the order to be completed by September 15, 1918. This order was followed by a formal contract May 16, 1918, No. 3870, embodying the previous order, between plaintiff and Lt.

Schnacke for and in behalf of the United States. Copies of the order and contract are attached to the petition as Exhibit No. 5 and are made part hereof by reference.

These were known as "combat" propellers.

June 25, 1918, plaintiff had completed 47 of these propellers.

On July 18, 1918, plaintiff, on receipt from the War Department of instructions to do so, shipped to the Dayton Wright Aeroplane Company 102 propellers to apply on contract No. 3870, order No. 21128. This shipment was accepted and paid for and as to it there is no controversy.

In the summer of 1918 and while plaintiff was engaged in the performance of contract No. 3870, order No. 21128, the War Department decided to abandon the Charavay design and did abandon it in August, 1918, and pursuant to such decision plaintiff was on August 2, 1918, directed in writing by the Bureau of Aircraft Production, War Department, "to stop all gluing operations on order no. 21128 until further instructions." The number of propellers of the Charavay design in process August 2, 1918, was 871. Captain (formerly Lieutenant) Schnacke on August 19, 1918, by direction of the Director of Aircraft Production, increased the price on contract No. 3870, order No. 21128, by $6,000, to cover certain extra wrapping and packing at $2 per propeller.

There were delivered to and accepted by defendant, on or about August 23, 1918, 102 propellers of the Charavay design on this contract, which have not been paid for, made, packed, and delivered at the price of $100 per propeller, amounting to $10,200. August 30, 1918, the Director of Military Aeronautics, through the Aviation Officer, Expedition Depot, Baltimore, Md., in writing asked of plaintiff shipping instructions for their return. No reason was assigned for returning them. Plaintiff did not furnish shipping instructions and they have not been returned to plaintiff.

The Bureau of Aircraft Production by telegram August 26, 1918, directed plaintiff to "hold all production on order twenty-one one twenty-eight."

The propellers of the Charavay design in process and not completed by plaintiff at the time of abandonment of the design could not be adapted to designs substituted by the War Department and had to be scrapped.

August 26, 1918, plaintiff in writing protested to the Director of Aircraft Production that due to interference on the part of his officers the company was unable to proceed with performance of contract No. 3870, order No. 21128, and asked for an investigation and relief. September 2, 1918, plaintiff in writing demanded of the Acting Director of Aircraft Production "payment for work performed and suitable compensation for losses and damages sustained" on order No. 21128, contract No. 3870.

14. July 13, 1918, O. R. Ewing, Capt. A. S. (P) N. A., acting by direction of the Director of the Bureau of Aircraft Production, placed with plaintiff an order in writing, No. 740026, for 2,000 constant speed regulating air fans, as per sample, at $29.38 each, total $58,760, to be delivered at the rate of 100 per week after 30 days, and 200 fans per week in 60 days, after date of receipt of order, 35 to be delivered within 30 days after date of receipt of order. Contract No. 4301 followed and embraced this order, was dated October 16, 1918, and was entered into between plaintiff and Capt. Schnacke, representing the United States.

December 6, 1918, Capt. Schnacke, acting by direction of the acting Director of Aircraft Production, wrote plaintiff in respect to order No. 740026 as follows: "You are hereby instructed to stop all production under this order, and incur no further expense in connection therewith."

December 19, 1918, a settlement contract, No. 4301–A, was entered into between plaintiff and defendant, terminating the original contract, and providing for the delivery of 100 air fans thereunder in addition to those already delivered, and no more, and for the payment to plaintiff by the United States of $38,758.43 upon the delivery of the 100 air fans, as full and final compensation under the original and settlement contracts.

Delivery of the air fans called for by the settlement contract was made to the defendant on or about December 28, 1918, bill for the sum of $38,758.43 presented by plaintiff, and payment refused, and no part thereof has been paid by the defendant.

15. On August 26, 1918, Capt. Schnacke, by direction of the Director of Aircraft Production, gave plaintiff a written order No. 720376, for 184 propellers for D H 4 planes with U. S. 12 engines, to be manufactured from quartered white oak, or from mahogany, according to specifications, at $150 per propeller, including individual boxes for shipment, total $27,600, delivery to be completed by October 1, 1918, contract No. 4578 to follow. This order related to the 184 propellers brought to the last stages of completion on the order for 750 propellers, hereinabove referred to in finding 9. Embodying this order, Capt. Schnacke, representing the United States as party of the first part, signed and transmitted to plaintiff as party of the second part a formal contract, No. 4578, dated August 29, 1918. Plaintiff refused to accept the order or sign the contract, by reason of the fact that they required the 184 propellers to be made in accordance with specifications not in existence at the time the original order for 750 propellers had been given and which were physically impractical to apply to the propellers already brought to the final stages of completion.

Copies of order No. 720376 and form of contract No. 4578 are attached to the petition as Exhibit No. 6 thereof and are made part of these findings by reference.

16. Beginning late in August, 1918, and extending into November, 1918, representatives of plaintiff and of the Bureau of Aircraft Production held several conferences upon the subject of plaintiff's contracts with the War Department and their mutual obligations thereunder. Among those present representing the Bureau of Aircraft Production was its acting director, W. C. Potter, and Lt. Col. A. C. Downey, for the Contract Department, Bureau of Aircraft Production. Plaintiff was represented by its president, Spencer Heath, and counsel. The final conference was held November 13, 1918, and as a result thereof the plaintiff proposed in writing that all completed and uncompleted work on orders other than the order for Charavay propellers, No. 21128, as to which the defendant was to further advise plaintiff, should be paid for "on a basis of cost of materials, all direct and indirect labor costs, all overhead charges, direct and indirect, covering the entire period since the beginning of work on the material and 10% profit on the costs so obtained except upon the cost of any material used in connection with the work which was supplied by the Government and not paid for by us." This proposition was agreed to by the defendant in writing.

17. Some time prior to February 25, 1919, plaintiff submitted to the Air Service Claims Board its claim under the Potter-Downey agreement and hearings were had thereon wherein plaintiff was confronted with an allegation of default in deliveries. The claim was disallowed by the Board February 25, 1919, because of the alleged default. July 13, 1920, the disallowance was rescinded by the Air Service Section, War Department Claims Board, and the claim approved in the sum of $181,467.66, based upon the following set-up:

| | |
|---|---|
| 1. Inventory of finished and partly finished propellers | $37,306.25 |
| 2. Inventory of walnut lumber | 129,053.61 |
| 3. Inventory of packing boxes | 5,756.76 |
| 4. Loss from cancellation of packing contract with Security Storage & Trust Co. | 177.42 |
| 5. Loss on copper | 752.15 |
| 6. Storage and insurance on inventory of finished and partly finished propellers from November 21, 1919, to June 21, 1920 | 7,163.48 |
| 7. Amount of payments by contractor for assisting U. S. Government officials in taking inventory April 17, 23, 1918 | 1,143.64 |
| 8. Office and administration expense | 114.35 |
| Total | 181,467.66 |

The government was to take title to all the property which it paid for.

Plaintiff appealed to the appeal section of the War Department Claims Board, which acted thereon April 13, 1921, and from the decision of the appeal section plaintiff appealed to the Secretary of War who, on May 7, 1921, affirmed the decision of the appeal section. Plaintiff refused to accept the decision of the appeal section, so affirmed by the Secretary of War, and on May 27, 1921, the appeal section entered an order denying all relief.

18. Plaintiff ceased manufacturing propellers for the War Department in September, 1918, except for work undertaken in subsequent years, not involved in this suit.

Subsequent to the Potter-Downey agreement an inventory was taken of propellers substantially finished, and of laminations, on hand at plaintiff's plant and not paid for, applicable to the transactions hereinabove described. There were found 2,694

propellers and 4,816 laminations, of the following numbered patterns:

| Pattern number | Propellers | Laminations |
|---|---|---|
| 130 | 615 | 1,149 |
| 149 | 10 | .............. |
| 150 | 208 | 206 |
| 151 | 297 | 40 |
| 154 | 104 | 74 |
| 158 | 71 | 28 |
| 160 | 811 | 1,389 |
| 165 | 578 | 1,930 |
| | 2,694 | 4,816 |

Pattern No. 130 was used on contract No. 1750, order No. 20005, and contract No. 1846, order No. 20054; pattern No. 149 on contract No. 3347, order No. 20859; pattern No. 150 on contract No. 1846, order No. 20054, and on contract No. 3349, order No. 20860; pattern No. 151 on contract No. 1846, order No. 20054; patterns Nos. 154 and 158 on the verbal order for 750 combat propellers given in February, 1918, and to which unsigned contract No. 4578, order No. 720376 relates; pattern No. 160 on contract No. 1846, order No. 20054; and pattern No. 165 on contract No. 3870, order No. 21128.

Patterns Nos. 154, 158, and 165 were for combat propellers; all other patterns were for training propellers.

It is not possible from the record to allocate to the several contracts or orders the propellers and laminations so inventoried except as may be deduced from the enumerations set forth in this finding.

Material, labor, and overhead expense on these 2,694 propellers and 4,816 laminations cost plaintiff $139,150.36, which with 10 per cent. profit amounts to $153,065.37, no part of which has been paid by the defendant. Their salvage value is problematical. They are now in storage at plaintiff's plant.

19. In August, 1919, the War Department, claiming the government to be the owner thereof, removed from plaintiff's premises 395,040 feet of unused walnut lumber, theretofore delivered to the plaintiff for use on government contracts for propellers and charged to plaintiff's account. Based on lumber invoiced to the plaintiff, the credit to plaintiff on account of the removal of the lumber, including expenses properly incurred thereon by plaintiff while in its possession, would be $145,741.71, which with 10 per cent. profit on such expenses, would amount to $147,142.86, in reduction of the charge theretofore made against the plaintiff.

20. The cost to plaintiff of unused packing boxes purchased especially for the shipment of propellers under the foregoing orders and contracts was $6,767.18, which with 10 per cent. profit amounts to $7,443.90. These boxes are now in plaintiff's hands. No part of $7,443.90 has been paid by the defendant. Their present salvage value is not of a substantial amount.

21. Plaintiff's loss due to its enforced cancellation of a contract with the Security Storage & Trust Company for packing 2,900 walnut propellers applying on Signal Corps contract No. 3870, order No. 21128, amounts to $1,724.35, which with 10 per cent. profit thereon amounts to $1,896.79, no part of which has been paid by the defendant.

22. The cost to plaintiff of sheet copper and copper rivets, purchased especially for tipping propellers on the several contracts and orders not completed, and on account of stoppage of the work, not used, amounts to $1,543.89, which with 10 per cent. profit is $1,698.28, no part of which has been paid by the defendant. Their present salvage value does not appear. They are now in storage on plaintiff's premises.

23. Plaintiff's overhead expense, applicable to the contracts and orders in suit, from the date of cessation of manufacture thereunder to November 20, 1918, was $76,695.83, which with 10 per cent. profit amounts to $84,365.41, no part of which defendant has paid.

24. Plaintiff's expense for storage, fire insurance, hauling and handling, and watchmen's services, from November 21, 1918, to January 21, 1922, beyond which date there is a continuing expense for storage, was, for the material described in finding 18, $6,277.80, which with 10 per cent. profit, aggregates $6,905.58, no part of which has been paid by the defendant.

25. Plaintiff's loss from the erection of second-story and office floors of the Key Highway Plant and installation of additional equipment, described in finding 5, making proper allowance for a proportionate part of the price of the entire building and equipment on the eventual sale thereof, amounts to $25,605.62.

26. Plaintiff expended for repairs, alterations, additions, and betterments on

leased premises, used as manufacturing plants, for the purpose of expediting the production of propellers for the War Department, on contracts and orders involved herein, less a suitable proportion applicable to propellers completed and shipped, $15,583.69, which amount is a loss to plaintiff.

27. Plaintiff expended for machinery and equipment built, partially built, or purchased by it, especially for the purpose of expediting the production of propellers for the War Department on orders and contracts involved herein, less a suitable proportion on machinery and equipment built or purchased applicable to propellers completed and delivered, $37,963.69. The fair salvage value thereof is $15,739.34, and the loss to plaintiff thereon is $22,224.35.

28. The expense to plaintiff of purchase and installation of 12 Cutler curtain kilns, purchased and installed under the circumstances recited in finding 6, was, less due allowance for propellers completed and delivered, $19,035.60. The salvage value of these kilns was $2,600, and plaintiff lost the difference in value, or $16,435.60.

29. For dies made for cutting copper tips on the contracts or orders enumerated in finding 18, less a proper allowance for propellers completed and delivered, plaintiff expended $851.76, no part of which has been paid by the defendant. They were made for a special purpose and when the occasion for their use disappeared had no value except as junk, which would be merely nominal.

30. In anticipation of orders from the War Department, plaintiff purchased clamps which were thereafter found to be in excess of actual requirements. They were required as part of the equipment for the addition to the Key Highway Plant and would have been needed if orders had been received from the War Department sufficient to run the plant at its capacity. They were not in fact used, now have only an inconsiderable salvage value, which does not definitely appear, and are in storage at plaintiff's factory. Plaintiff paid for them $4,134.64.

31. In order to provide transportation equipment sufficient to care for the needs of its plant as enlarged in the manner and to the extent heretofore described, plaintiff purchased two extra motortrucks. For them plaintiff's expenditure, less a proportion applicable to propellers completed and delivered, was $5,002.83. The trucks were sold by plaintiff at a price the appropriate portion thereof, here applicable, is $2,891.13, a difference of $2,111.70, which amount was lost by plaintiff.

32. For boiler plant purchased and installed especially for the purpose of expediting the production of propellers for the War Department the plaintiff expended, with appropriate deduction, for boilers and equipment actually used, of an amount applicable to propellers completed and delivered, $9,796.97. The fair salvage value thereon is $5,388.34, a difference of $4,408.63, which amount is a loss to the plaintiff.

33. The propellers, 102 in number, at $100, total $10,200, that were delivered to and accepted by the defendant, and thereafter offered to be returned, as recited in findings 13 and 16, and embraced in the Potter-Downey agreement, did not embody any departures of design which would have rendered them less serviceable for use than propellers as to which no departure from the design was alleged, and defendant's engineering department so found to be a fact. It is conceded that plaintiff should recover on this item.

34. There is due the plaintiff on various unpaid items, set forth in the petition at pages 14 and 15 thereof, the sum of $57,364.51, as to which there is no dispute.

35. There is due the defendant from plaintiff $437,891.01 for lumber delivered by it to the plaintiff from time to time to apply on orders and contracts of the War and Navy Departments. This offset is conceded by the plaintiff and the amount thereof claimed and agreed to by the defendant.

36. In all instances written orders were preceded by verbal orders and plaintiff began to manufacture propellers before receipt of the formal order. In complying with all verbal orders, plaintiff assumed that the issuing officers had sufficient authority therefor, and did not inquire into their contractual powers. No claim is made that the officers who gave orders for propellers, either verbal or written, did not have authority so to do.

37. During the period it was manufacturing propellers for the War Department plaintiff was making a considerable number for the Canadian Government.

Commencing in June, 1918, plaintiff began the manufacture of propellers also for the Navy Department of the United States.

All propellers manufactured for and delivered to the Navy Department have been paid for and no claim is made upon them.

38. During the progress of the work for the War Department plaintiff represented to its officers that it was investing its resources for emergency work without sufficient business from the War Department to recoup the expense, and in writing April 18, 1918, made formal protest to the Chief Signal Officer of the Army with respect to the situation complained of.

39. Plaintiff has at all times been ready, willing, and able to complete its contractual obligations to the War Department, and is now prepared to turn over to the defendant all property in its possession belonging thereto upon settlement of its claims herein.

### Counterclaim.

The petition in this case was filed February 25, 1922. On September 4, 1926, defendant filed a counterclaim for $19,512.44, with interest, comprising alleged unpaid additional assessment in 1920 of income taxes. An amended counterclaim was filed November 12, 1927, embracing the items of the original counterclaim and adding thereto alleged unpaid additional assessments made in 1923 and 1924, making a total of $212,870.58.

The counterclaim as amended rises under the following circumstances:

40. On or about April 27, 1918, plaintiff filed with the collector of internal revenue its corporation income tax return for the calendar year 1917 indicating a tax due thereon of $20,506.81, and its corporation excess profits tax return for the same year indicating a tax due thereon of $18,242.88, a total income and profits tax of $38,749.69, which was assessed and paid.

September 2, 1920, the Commissioner of Internal Revenue made an additional assessment of $18,280.48 for 1917 against plaintiff, which plaintiff has not paid.

March 26, 1923, the Commissioner made a further additional assessment against plaintiff for 1917 of $1,954.37, which plaintiff has not paid.

Plaintiff was duly notified of both assessments.

The total of the two additional assessments for the year 1917 is $20,234.85, and there is no evidence that the basis or calculation thereof is incorrect.

41. For the calendar year 1918 plaintiff, on or about June 16, 1919, filed with the collector its corporation income and profits tax return indicating a tax due thereon of $48,778.31, and on June 21, 1920, an amended return indicating a tax in the lesser amount of $39,304.06, a difference of $9,474.25. The original tax of $48,778.31 was assessed and paid.

June 14, 1924, the Commissioner assessed against plaintiff a tax for 1918 of $191,403.77, in addition to that already assessed and paid, and duly notified plaintiff with regard thereto. No part thereof has been paid by the plaintiff.

In its original and amended returns for 1918, plaintiff computed its war profits and excess profits tax under section 301 (a) of the Revenue Act of 1918 (40 Stat. 1088). In its amended return it indicated a net income of $66,996.38 by reason of which it did not benefit by the application of section 302 of the act (40 Stat. 1089).

The additional assessment of $191,403.77 for the year 1918 was computed by the Commissioner by revising plaintiff's amended return for that year as follows:

| | | |
|---|---|---|
| Income reported | | $66,996.38 |
| Add: | | |
| Inventory adjustments: | | |
| (1) Walnut lumber | $70,351.95 | |
| (2) General stores | 23,442.50 | |
| (3) Material purchases overstated | 42,421.68 | |
| (4) Ordinary expenses overstated | 124.34 | |
| (5) Amortization disallowed | 106,558.87 | |
| | | 242,899.34 |
| | | 309,895.72 |
| Less additional depreciation allowed | | 6,429.24 |
| Amended net income | | 303,466.48 |

The invested capital was computed by the Commissioner as follows:

| | |
|---|---|
| Capital stock | $12,900.00 |
| Surplus | 82,070.90 |
| Reserve for bad debts | 425.00 |
| | 95,395.90 |
| Less 1917 tax due June 15, 1918, $40,741.71 prorated 200 days | 22,324.23 |
| (6) Adjusted invested capital | 73,071.67 |

With these adjustments the Commissioner computed the profits tax liability under section 301 of the Revenue Act of 1918 as $234,527.45 and under section 302 thereof, $231,873.18. The ultimate tax he accordingly figured as follows, deducting from net income an item of $352.49 interest on obligations of the United States,

theretofore included by the taxpayer in gross income:

Net income .................................. $303,466.48
Less:
  Profits tax ..................... $231,873.18
  Exemption ...................... 2,000.00
  Interest ........................ 352.49
                                              234,225.67
                                          ─────────────
                                               69,240.81
Taxable at 12%.............................   8,308.90
Profits tax ...............................  231,873.18
                                          ─────────────
  Total tax liability.....................  240,182.08
Less previously assessed and paid on
  original return .........................   48,778.31
                                          ─────────────
  Additional tax ........................  191,403.77

(1) Walnut lumber, $70,351.95.—The sum of $70,351.95, added by the Commissioner to inventory, is the amount used by plaintiff in its return to reduce an inventory of lumber December 31, 1918, to its estimate of "realizable value." Without such reduction its inventory of lumber would stand at the price delivered and invoiced to it by the government under the contracts and orders hereinabove described. The reduction did not exceed a reasonable amount, based on market prices prevailing at the end of the year 1918.

(2) General stores, $23,442.50.—In its return for 1918 plaintiff reduced its inventory of general stores, taken December 31, 1918, at cost, by $23,442.50, to adjust the inventory to market value. The fair market value was $28,545.79, and the inventory at cost $51,988.29. The said sum of $23,442.50 is the addition to inventory of general stores made by the Commissioner.

(3) Material purchases overstated, $42,-421.68.—The sum of $42,421.68 added by the Commissioner to inventory for "material purchases overstated" was accounted for by the examining field agents of the Bureau of Internal Revenue as "machinery purchases charged to operation instead of being capitalized." There is no satisfactory proof that the Commissioner's adjustment of this item is incorrect.

(4) Ordinary expenses overstated, $124.34.—The increase in inventory by reason of "ordinary expenses overstated" was $124.34. There is no satisfactory proof that this adjustment by the Commissioner was incorrect.

(5) Amortization disallowed, $106,558.-87.—In its first return for 1918 plaintiff claimed for amortization of war facilities $111,388.67, decreasing it to $106,558.87 in the amended return. For the Key Highway Plant plaintiff, out of the amortization of $106,558.87, claimed as applicable to the year 1918, $51,120.75. This is a fair amount for amortization of the Key Highway Plant for the year 1918.

A reasonable allowance for amortization on miscellaneous machinery, tools, and equipment, used in the manufacture of articles contributing to the prosecution of the war is, for the year 1918, $45,667.-82.

The total reasonable amortization for plant and machinery is $96,788.57.

(6) Adjusted invested capital, $73,071.-67.—In its amended return for 1918, plaintiff reported a net invested capital of $192,456.83. Plaintiff calculated this as follows:

Capital stock ........................... $120,000.00
Surplus ................................. 122,097.98
                                        ─────────────
  Total ................................. 242,097.98

From which it deducted the following items:

Valuation of patents..................... 38,404.55
Proportion of Federal taxes paid.......... 11,236.60
                                        ─────────────
  Total ................................. 49,641.15
Net invested capital..................... 192,456.83

The Commissioner revised the net invested capital to $73,071.67, calculated as follows:

Capital stock ........................... $12,900.00
Surplus ................................. 82,070.90
Reserve for bad debts.................... 425.00
                                        ─────────────
  Total ................................. 95,395.90

From which he deducted:

Proportion of Federal taxes due........... 22,324.23
                                        ─────────────
Net invested capital..................... 73,071.67

Upon its organization plaintiff acquired as assets the patent rights on the design and construction of propellers, hereinabove described in finding 1, issuing stock of the par value of $107,100 therefor. Their value January 1, 1918, depreciated from $107,100, was $68,154.45.

These patents were essential to the conduct of plaintiff's business. At the times involved in this suit propellers made according to the design and construction, so patented, were of demonstrated superiority, generally, over other propellers and plaintiff's success depended materially on this fact.

There is not sufficient evidence to make a calculation of plaintiff's net invested cap-

ital and the amount of its taxes for the year 1918 except by using the Commissioner's computation as the basis and revising it where the evidence shows it to be incorrect.

42. On or about March 13, 1920, in accordance with permission granted by the Commissioner, plaintiff filed a tentative corporation income and profits tax return for the calendar year 1919, in which, without details, it estimated its tax at $2,000 and therewith paid $500, and on or about June 15, 1920, filed its completed return indicating a tax of $3,913.-15, which was assessed, and the balance, $3,413.15, in due course paid.

On or about October 29, 1924, plaintiff was notified by the Commissioner of an overassessment of $2,181.59 for the year 1919, and a certificate of overassessment was in due course mailed to the plaintiff in that amount. It does not appear in what manner, if at all, the overassessment was applied, whether by way of credit or cash refund.

### Conclusion of Law.

Upon the foregoing special findings of fact, which are made part of the judgment herein, the court decides, as a conclusion of law, that the plaintiff is entitled to recover the sum of $16,254.96.

It is therefore ordered and adjudged that the plaintiff recover of and from the United States the sum of $16,254.-96.

J. Kemp Bartlett, of Baltimore, Md. (Williams, Myers & Quiggle, of Washington, D. C., and Bartlett, Poe & Claggett, of Baltimore, Md., on the briefs), for plaintiff.

George H. Foster, of Washington, D. C., and Frank J. Wideman, Asst. Atty. Gen., for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

GREEN, Judge.

The plaintiff during the World War was engaged in the manufacture of airplane propellers and was given a series of orders by defendant for these propellers. In preparation for the work required and in order to expedite it, the plaintiff enlarged its plant, installed additional machinery and equipment and otherwise increased its facilities. As the work progressed the defendant suspended or canceled orders which it had given by reason of change in design or some other cause and finally as the war came to a close suspended work on the contracts altogether. Some of the propellers ordered were finished and paid for, some were finished but not paid for, and there were a large number upon which more or less work had been done at the time when the contracts were canceled. After all work on the propellers had ceased by reason of directions received from defendant, the plaintiff and defendant entered into an agreement known as the Potter-Downey agreement which provided for payment to the plaintiff for the work it had done on the unfinished propellers and for the cost of material used in this work. But after this agreement had been executed the plaintiff and defendant were still unable to agree as to the amount to which plaintiff was entitled under the contracts and plaintiff has not been paid even the amount provided for by this so-called Potter-Downey agreement. Plaintiff now brings this suit to recover the amount which is due under this agreement and also the loss and damage which it alleges it has sustained by reason of the suspension and cancellation of the contracts.

The defendant has filed a counterclaim for taxes assessed for the three years 1917, 1918, and 1919, but it is conceded that any further collections for the years 1917 and 1919 are barred by the statute of limitations.

In plaintiff's petition, seventeen items of charges, loss and damage are listed against defendant totaling $582,129.04. Plaintiff concedes, however, that there is due the defendant for lumber $437,891.-01 and asks judgment for the balance, $144,238.03.

Eight of plaintiff's claims are conceded by defendant and it is only necessary in determining the amount of plaintiff's recovery to pass on the disputed items which will be hereinafter set out and considered.

Among the claims disputed by defendant is one for $84,365.41 "for continuing overhead expenses from date of discontinuance of manufacture to date of termination of contracts" which includes 10 per cent. profit thereon.

The so-called Potter-Downey agreement which will be considered more at length hereinafter provided for the payment to

plaintiff of overhead expenses and 10 per cent. profit thereon. The agreement clearly covered the claim now being considered but it is said that plaintiff was at the same time engaged on work for other parties and that it has failed to establish by the evidence the proportion of overhead properly chargeable to defendant. This is a question of fact upon which the commissioner of this court found in favor of the plaintiff. After reviewing the evidence, we agree with the court commissioner and think it would serve no useful purpose to discuss the oral and written testimony in relation to this item. It is therefore allowed to plaintiff.

The next item of plaintiff's claims disputed by defendant is $34,306.55 "for loss resulting from erection of second story and office floors of claimant's Key Highway Plant and from installing additional special equipment therein."

The evidence shows that in preparation for the work contemplated by the contracts the plaintiff added a second story to what was known as its Key Highway Plant and that this second story was specially fitted and equipped for use in connection with the lower story in constructing propellers. Defendant does not deny this, but says that there was no agreement that the government should pay for an addition to plaintiff's plant, or for additional machinery and equipment, and if there had been such an agreement the officer of defendant that made the arrangements with plaintiff had no authority to make any such contract. This may be conceded for the purposes of the argument, but we do not think these matters prevent plaintiff's recovery thereon. The evidence, however, does show that Lt. Ryerson, head of the propeller section who was charged with making arrangements for the production of propellers for the air service, visited plaintiff's plant and while expressing himself as pleased with it in a general way said it did not have capacity to manufacture the number of propellers that the War Department required and urged plaintiff to add another story with additional facilities, and plaintiff, through its president, agreed so to do. Subsequently, having in the meantime received orders for a very large number of propellers, the plaintiff went ahead with the construction of the second story which was completed some time in the middle of summer in 1918.

The case is very similar to that of the Barrett Co. v. United States, 273 U.S. 227, 47 S.Ct. 409, 412, 71 L.Ed. 621. In that case the Navy Department contracted for certain materials to be furnished within a given time. The contract also provided for the construction of a plant with equipment with which to carry out its provisions. The plaintiff, believing that a larger plant than was contracted for would be necessary for the manufacture of the material required by the government, expended a large sum to increase its capacity. None of these changes were directly authorized or approved by the Navy Department, but the Supreme Court said that the plaintiff was entitled to just compensation under the statute and that just compensation included "the outlay which it can show there was reasonable ground for making in order to fulfill its engagements." What we have stated above with reference to the case now before us shows that as the government requirements were presented to plaintiff there was abundant reason for an enlarged plant and additional facilities.

The defendant, however, contends that the Barrett Co. Case, supra, and other similar cases have no application for the reason that they were based on the statute of June 15, 1917, which provided for just compensation whenever war contracts were suspended, canceled, or modified, but applied only to contracts for the "building, production, or purchase of ships or material," and that other language in the statute shows that the word "material," as used therein, refers only to stores, supplies, and equipment for ships. This seems to be a very narrow construction of the statute, but we can find no case in which it has otherwise been applied. The defendant not only insists that the statute referred to above has no application to the case now before the court, but says also that if it did apply, the contracts were not canceled pursuant to its provisions. We do not think this precludes the plaintiff from recovering for loss or damage occasioned by the cancellation or suspension of the contracts. The general principles in relation to contracts will still apply and plaintiff is not left without a remedy for violation of the agreements, express or implied, made by defendant. Under well-settled authority plaintiff could have elected to treat the contracts as still in force, and, if it had so elected, could recover for potential profits, but by execut-

ing the Potter-Downey agreement it elected to consider the contracts terminated by the breach thereof made by defendant. We are clear that plaintiff may recover what it lost by reason of the cancellation of the contracts even if it be conceded that there is no special statute which so provides.

This court and the Supreme Court long ago fixed the rules for the measure of damage when a contract was suspended or canceled in the case of Behan v. United States, 18 Ct.Cl. 687, affirmed in United States v. Behan, 110 U.S. 338, 4 S.Ct. 81, 84, 28 L.Ed. 168. In that case this court said that "in calculating the damages to a contractor when, without his fault, the other party, during its progress, puts an end to the contract before completion, the object is to indemnify him for his losses sustained." The Supreme Court, in passing on the same question, said with reference to the contractor's rights in such a case: "When he elects to go for damages for the breach of the contract, the first and most obvious damage to be shown is the amount which he has been induced to expend on the faith of the contract, including a fair allowance for his own time and services."

The Supreme Court went on further to say that the contractor may also claim and recover, if proved, anticipated profits. In the case at bar there is no attempt to show any anticipated profits, probably because the Potter-Downey agreement rendered such profits not recoverable, but the Supreme Court went on to say that "It does not lie, however, in the mouth of the party, who has voluntarily and wrongfully put an end to the contract, to say that the party injured has not been damaged at least to the amount of what he has been induced fairly and in good faith to lay out and expend * * * after making allowance for the value of materials on hand; at least it does not lie in the mouth of the party in fault to say this, unless he can show that the expenses of the party injured have been extravagant, and unnecessary for the purpose of carrying out the contract."

There is nothing to show that any of the expense incurred by the plaintiff was extravagant and unnecessary for the purpose of carrying out the contracts. On the contrary, when we consider all of the testimony and the circumstances under which the contracts were made it appears that plaintiff had good cause and reason to make the additional expenditures by reason of which it incurred the losses which it now seeks to recover. The contracts were made in war times. It is a matter of common knowledge that the government was then in urgent need of airplanes. War never admits of delays or even of ordinary preparations and exertions. Its needs are urgent and pressing and it must have been well understood by plaintiff that it was making contracts to supply what are commonly referred to as "rush orders." Plaintiff was told by one of defendant's officials that its plant was insufficient, and the evidence as a whole shows that it was amply justified in providing additional facilities for hastening the completion of the orders which it received.

As a further objection to this claim, and the remainder of the disputed items, it is urged on behalf of defendant that plaintiff cannot recover for loss and damage resulting from cancellation or suspension of the contracts by reason of the so-called Potter-Downey agreement set out in finding 16 to which reference has heretofore been made. It is contended that this agreement disposed of all claims of every kind and nature which the plaintiff held against the defendant arising out of orders given for construction work.

The so-called Potter-Downey agreement was divided into two parts, one which related to the item of $10,200 for Charavay propellers which was left unsettled but is now conceded by defendant, and another part which provided that the plaintiff should "be paid for all *work* as it now stands on a basis of cost of materials, all direct and indirect *labor costs,* all *overhead charges* * * * and *10% profit* on the costs so obtained. * * *" (Italics ours.)

It is contended on behalf of defendant that this agreement operated as a full settlement of all claims arising out of the contracts including the claims which are now in dispute. This contention cannot be sustained. If it had been intended that this agreement should act as a full settlement to all claims which the plaintiff held, there is every probability that it would have been so provided in express language, for this would have been the ordinary and usual course. Moreover, the agreement mentions three and only

three distinct items for which payment was to be made, namely, work, labor costs, and overhead charges. It provided for the recognition and measuring of claims based on these matters. Obviously the plaintiff had other claims against the defendant growing out of the suspension and cancellation of the contracts, some of which had already been presented to defendant. There is no evidence to show that these claims were taken up in any manner when the negotiations were had that led to the Potter-Downey agreement. On the contrary, as the agreement made specific mention of certain of plaintiff's claims against defendant this tends to show that those not mentioned were excluded from its operation. A reasonable construction of the Potter-Downey agreement under all of the circumstances of the case shows that it settled nothing except those matters included in its specifications, and it cannot properly be contended that these specifications covered the claim for the addition of the second story to the Key Highway Plant and the equipment connected therewith or any of the remaining disputed claims which will next be considered. This claim therefore should be allowed.

■ The amount of the loss of plaintiff incurred by reason of the construction of the second story of the Key Highway Plant with its equipment was found by the court commissioner to be $25,605.62, and with this finding we concur. Plaintiff also claims to be entitled to 10 per cent. profit on this amount, or a total of $34,306.55, but no explanation is given as to why a profit should be allowed thereon. It is plain and we have already held that the item was not covered by the Potter-Downey agreement which provided for 10 per cent. profit on certain items. Plaintiff should be awarded compensation for its loss, but there is no reason why it should be allowed a profit thereon and this portion of plaintiff's claim is denied. For the same reason, the plaintiff cannot be allowed profit on any of the disputed items hereinafter mentioned.

■ There is no exception to the finding that plaintiff expended for repairs, alterations, additions, and betterments on leased premises, used as manufacturing plants, for the purpose of expediting the production of propellers for the War Department, on contracts and orders involved herein, less a suitable proportion applicable to propellers completed and shipped, $15,583.69.

These expenses were a loss to plaintiff except in so far as they facilitated work upon the propellers which were completed and paid for, and for this matter a deduction is made. Plaintiff should be allowed $15,583.69 on this item.

■ On its claim for what it expended for machinery and equipment for the purpose of expediting the production of propellers, the plaintiff is entitled to recover the cost thereof, less a suitable deduction on account of propellers completed and delivered and a further deduction of the salvage value. Under this rule the facts found show that plaintiff is entitled to recover $22,224.35.

■ Another claim of plaintiff is based on the purchase and installation of 12 Cutler curtain kilns which were facilities added for the purpose of more rapidly completing the contracts, and the cost thereof, less due allowance for propellers completed and delivered, was $19,035.60. We think there is some evidence that tends to show that the market value of these kilns after the cancellation of the contracts was only $2,600. This would be the salvage value of the property and on this basis plaintiff sustained a loss of $16,435.60, which should be allowed in computing its damages.

■ The claim for $851.76 for dies (see finding 29) should be allowed plaintiff, but the item of $4,134.64 for clamps purchased in excess of normal requirements cannot be allowed for the reason that the purchase was made in anticipation of further orders and contracts which never were received from the government.

■ We think the plaintiff should be allowed $2,111.70 on account of extra motortrucks purchased to increase the facilities of the plant, and also $4,408.63 on account of boilers and equipment used in connection therewith purchased and installed to expedite the production of propellers.

There is no claim that anything has been paid plaintiff on any of these disputed items.

■ The facts which support the eight items or claims made on behalf of plaintiff upon which defendant concedes plaintiff is entitled to recover are set out in findings 18, 19, 20, 21, 22, 24, 33, and 34. The total of the items conceded in plaintiff's favor is $385,717.29. Adding this amount to the total of the amount allowed plaintiff on the

disputed claims, we find that the aggregate sum allowed plaintiff is $557,304.05. From this should be deducted $437,891.01, which plaintiff concedes is due defendant for lumber. The balance, $119,413.04, is the amount we find plaintiff is entitled to recover on the various claims set out in its petition. Plaintiff claims to be entitled to interest on part of this sum, but plaintiff's recovery is not based upon a statute which awards "just compensation," and under the general rules with reference to contracts no interest can be allowed.

### Defendant's Counterclaim.

In the year 1924 the Commissioner of Internal Revenue made an additional assessment of income taxes against the plaintiff for the year 1918 in the amount of $191,403.77, no part of which has been paid. The counterclaim is based on this assessment. The plaintiff asserts that the assessment resulted principally from the fact that the Commissioner of Internal Revenue added large sums to plaintiff's gross income and greatly increased its net income by refusing to allow the plaintiff to set up its closing inventory for the year in question at its then market value and by substituting in lieu thereof the cost of the inventoried articles which were purchased while this country was at war. Plaintiff further contends that when the Commissioner of Internal Revenue increases the taxpayer's closing inventory and thus increases its income for the year in question the burden is upon the defendant to establish that the change was correctly made and that as defendant has presented no evidence on this point the additional assessment must be set aside. We do not need to determine what the rule would be if the Commissioner had claimed on the trial of the case that plaintiff's taxes should be larger than the amount which was assessed, or had otherwise sought to show that his ruling in the matter was incorrect, for no such claim is made here. The defendant relies on an assessment regularly made. It was the final decision of the Commissioner and it is well settled that his determination is prima facie correct. This rule is founded in reason for the taxpayer has full knowledge of all of the facts pertaining to a proper assessment while often the government officials are without the means of obtaining proper information. A contrary rule would often put the government at the mercy of an unscrupulous taxpayer whose dealings were not open and aboveboard.

The plaintiff, however, insists that even if it has the burden of proof, this burden has been met and sustained by the evidence which it introduced. With this conclusion we do not agree, but, on the contrary, have found that the evidence in the case is not sufficient to enable a calculation of plaintiff's taxes to be made except by using the Commissioner's computation as a basis. This conclusion, however, does not, in our opinion, prevent corrections being made in definite and specific items where it is shown that the Commissioner's action was erroneous, and the same rule applies to inventories.

The plaintiff owned certain valuable patents which it had acquired by issuing stock of the par value of $107,100 therefor. As the evidence shows that the stock was worth par, the patents may be said to have a cash value of that amount. The Commissioner, however, did not include anything on account of the patents in the amount found by him to be the invested capital of the plaintiff. The total amount of capital stock outstanding was $120,000. The Revenue Act of 1918 (section 326, 40 Stat. 1092) provided with reference to intangible property which formed a part of invested capital that the taxpayer, in making up the amount of its invested capital, might include either the actual cash value of such property, or the par value of the stock or shares issued therefor, or 25 per cent. of the par value of the stock outstanding, whichever is the lowest. The taxpayer therefore was entitled to have included in its invested capital 25 per cent. of the par value of the total amount of the stock outstanding, which was $30,000, and this amount should be added to the amount of invested capital as found by the Commissioner.

In its return for 1918 as amended the plaintiff claimed $106,558.87 for amortization of war facilities. The Commissioner of Internal Revenue disallowed this claim and the court commissioner found that a reasonable amount for amortization was $96,788.57. It is contended on behalf of defendant that if plaintiff's damage claims based on expenses incurred and losses sustained on special facilities in the way of buildings and material acquired for the purpose of completing the contracts are allowed, plaintiff cannot also have amortization for the same items.

Amortization is allowed, if at all, under the provisions of the statute (section 234 (a) (8), Revenue Act of 1918, 40 Stat. 1078) "in the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war."

The statute further provides that "there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vessels *as has been borne by the taxpayer.* (Italics ours.)"

Every item for which amortization could be properly claimed is included in the allowances already made to plaintiff for damages sustained by reason of the defendant's suspension or cancellation of the contracts, consequently the costs involved have not been borne by the taxpayer. The taxpayer has lost nothing by reason of these matters and is not entitled to amortization therefor. See A. J. Tower Co. v. Commissioner (C.C.A.) 38 F.(2d) 618.

■ It may be argued that in the case last cited above the items of damage which also covered the matters for which plaintiff claimed amortization, had been previously allowed and determined, while in the case at bar the defendant had disputed and is still disputing the validity of these claims; and the costs or expenses which plaintiff seeks to have amortized have so far been borne by the taxpayer. We do not think a reasonable construction of the act requires that such a distinction should be made. The effect of such a construction in cases like the one at bar, or in any case in which the government did not make settlement of the damage claims within the taxable year, would be that a taxpayer would not only recover the amount of his costs and expenses as damages, but receive another allowance of the same kind by way of amortization. Congress intended by the amortization provisions of the act to compensate the taxpayer for losses actually sustained and not for a cost which the courts order repaid to him. We think the words "borne by the taxpayer" mean that the taxpayer on the final adjudication of his account with the government sustains the burden of the costs and expenses which he seeks to have amortized. What is said in United States Cartridge Co. v. United States, 284 U.S. 511, 52 S.Ct. 243, 76 L.Ed. 431, as to the difference between obsolescence and amortization has no application here.

■ Plaintiff also contends that in computing its net income for 1918 the Commissioner erred in using the cost price as the value of the lumber on hand which was included in its closing inventory. Plaintiff claims that the market price at the close of the year should have been used instead and asks to have a deduction made from the inventory of the difference between the cost and market price of the lumber. We do not understand on what theory the Commissioner based his action. In one division of the argument, defendant assumes that the lumber never was the property of plaintiff, but if this were so it is manifest that nothing should be included in the inventory on account of it. We do not need, however, to consider this assumption as it is entirely inconsistent with the position of both parties. The facts are that the defendant furnished the plaintiff with a large quantity of walnut lumber and made a charge against plaintiff for it. This charge and the amount thereof is conceded by plaintiff. After the contracts were canceled, defendant removed or took back the unused portion of the lumber and plaintiff claims a credit on account of this action. This credit and the amount thereof is conceded by defendant and we have followed these concessions in determining the amount which plaintiff is entitled to recover. On this basis, defendant again objects on the ground that plaintiff has been allowed a credit for the lumber returned and having lost nothing by reason of the defendant having taken back the unused lumber it is not entitled to any amortization thereon. But this is not an amortization item. It is a matter of inventory and the question is: What was the amount of plaintiff's inventory at the close of the year 1918? At that time defendant had not taken back the lumber and plaintiff had no assurance that defendant would take it back and give a credit for the lumber thus returned. The case of United States Cartridge Co. v. United States, supra, involved a similar situation. In that case, as in the case now before us, the government subsequently took back certain property or made settlement for it, but the Supreme Court decided that the closing inventory of the taxpayer should be based on the market value of the property then held by it during the

tax year under consideration. Following the decision in this case, a correction should be made in the calculation of the tax by the Commissioner of Internal Revenue by deducting from the amount of the inventory as found by him the difference between the market value of the lumber then held by the taxpayer and the cost price thereof as used by the Commissioner. This difference is $108,477.98.

Another correction should be made in the Commissioner's calculation of the tax for 1918. In determining the amount of net income he fixed the value of what have been called by both parties "general stores" in the closing inventory at cost when it should have been fixed at the market value. This made a difference of $23,442.50, for which plaintiff is entitled to a deduction from the amount of net income fixed by the Commissioner.

The Commissioner, in computing the net income of plaintiff for 1918, included in the inventory $42,421.68 for purchases which he found to have been erroneously not capitalized. Plaintiff claims this was an error but no satisfactory evidence has been presented to support this claim and it is disallowed.

After making the corrections in invested capital and net income as stated above, we find that the 1918 tax of plaintiff should be computed on the basis of $103,071.67 as the invested capital and $171,546.00 as the net income. Making the calculation on this basis, we find that the excess profits tax of plaintiff for 1918 is $100,916.17 and its income tax, $8,235.58, making a total of $109,151.75. Plaintiff paid on its tax for that year $48,778.31. The tax was therefore underpaid in the sum of $60,373.44.

The circumstances of the case cause the question to arise as to whether the defendant should be allowed interest on the deficiency for 1918. We have already found and determined that at the close of 1918 defendant was indebted to plaintiff on the matters which form the basis of plaintiff's suit in a sum much larger than the amount of this tax, but we have also decided that plaintiff could not be allowed any interest thereon. The statute provides for interest on the tax from the time it was assessed, and it may seem quite inequitable that the defendant should be allowed interest on the amount of this tax for a number of years during all of which it was indebted to the plaintiff. If the case were between private individuals to be decided upon their respective claims, such a result would not follow; but, as was said in United States v. Verdier, 164 U.S. 213, 218, 17 S.Ct. 42, 44, 41 L.Ed. 407: "We are unable to see how the fact that there were mutual claims can authorize us to disregard the plain letter of the statutes."

In the case last cited, each party had claims against the other. The government first established its claims and in another case obtained a judgment against Verdier which under the statute drew interest. Verdier then brought suit in the Court of Claims to recover a portion of his salary due him by readjustment under a special statute. The Court of Claims found that the government was indebted to Verdier at the time it obtained its judgment although the amount had not then been ascertained in a sum greater than the amount owed by Verdier to the government. As the law did not permit Verdier to be allowed any interest, the Court of Claims held that it would be inequitable to allow the government interest and entered its judgment accordingly. When the case came before the Supreme Court on appeal, that court said: "It would certainly seem to be equitable that, if the government were indebted to Verdier at the time it obtained judgment against him, it should not charge him with interest upon its judgment. But, interest being a matter of purely statutory regulation, we are bound to give or withhold it as the statute directs."

The court also said: "An inherent vice of petitioner's argument is in the assumption that he and the government stand upon an equality with respect to interest. The truth is that, in its dealings with individuals, public policy demands that the government should occupy an apparently favored position. It may sue, but, except by its own consent, cannot be sued. In the matter of costs, it recovers, but does not pay, and the liability of the individual would not be affected by the fact he had a judgment against the government which did not carry costs. [Citing many cases previously decided by the Supreme Court.]"

While the case last cited does not involve a claim for taxes, the principles laid down in its decision apply here. Interest will be computed on the amount of plaintiff's tax for 1918 at 6 per cent. from June 14, 1924, when the Commis-

sioner made the additional assessment, to the date of the judgment herein, April 6, 1936. The interest so computed is $42,-784.64, which added to the amount of the underpayment of the tax makes a total of $103,158.08 due defendant upon its counterclaim. Subtracting this from the amount which we have found plaintiff is entitled to recover on the cause of action set out in its petition, the balance in favor of plaintiff is $16,254.96, for which judgment will be entered in its favor accordingly.