**UNITED STATES v. MILNOR CORP.**

**C. A. No. 8726.**

United States District Court
E. D. Pennsylvania.

Sept. 12, 1949.

Philip R. Miller, Sp. Asst. to the Atty. Gen., Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe, Sp. Asst., to the Atty. Gen., Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., Thomas J. Curtin, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Clement J. Clarke, Jr., Thomas E. Comber, Jr., Philadelphia, Pa., James A. Moore, Philadelphia, Pa., James S. Y. Ivins, Washington, D. C., for defendant.

WYCHE, District Judge.  (sitting by designation)

This is a suit brought by the United States for the recovery of corporate income and excess profits taxes for the year 1942, in the sum of $75,879.72, and interest, which the Government claims was erroneously refunded to the taxpayer, the defendant in this case.  The case is before me upon the Government's motion for summary judgment upon the pleadings, supported by certified copies of documents from the files of various Government departments, and the defendant's cross-motion for judgment in its favor.

At the hearing of the motions, the plaintiff moved to strike an exhibit containing the Commissioner's Ruling, submitted with defendant's Motion to Strike.  This motion is denied.

The defendant moved to strike the following exhibits submitted with plaintiff's motion for summary judgment, as irrele-

vant: Address by David Ginsburg, Legal Adviser, Price Stabilization Division; a Memorandum of the Price Stabilization Division; Minutes of the Advisory Commission to the Council of National Defense; Commission Minutes; and a release by the Federal Reserve System. Counsel for defendant, however, have agreed that these documents shall be available to me and on appeal, as public records, and they have been so considered by me, although, in my opinion, they are not properly admissible as evidence.

On February 28, 1941, the taxpayer and the Navy Department entered into a "Contract for the Acquisition and Installation of Special Additional Plant Equipment and Facilities Required to Expedite the National Defense Program".

Under the contract the taxpayer agreed to undertake the production at its plant of heavy forgings necessary for the national defense, provided the Navy Department agreed to pay for certain additional facilities. These additional facilities were to consist of buildings, furnaces, machine tools and other equipment. And the taxpayer agreed that the price of the forgings would not include any amount or allowance for the cost, amortization or depreciation of such facilities. The total cost of the emergency plant facilities, all of which were described in detail in the contract, was estimated at $2,500,000. Title to the facilities was to be in the taxpayer. But it was not to allow any mortgage or other lien to encumber the property except a mortgage or lien given as additional security to an assignee of the taxpayer's claim against the Government under the very contract merely to insure the Government's payment, and even then only if the mortgagee's or lienor's rights were subordinate to those of the Government. The taxpayer could make no conveyance or transfer of title to the facilities or any item of them. It was also required promptly to remove all mechanic's liens, tax liens, and other similar liens arising in the ordinary course of business, and to carry all the customary forms of insurance on the property. The taxpayer was to furnish the Navy Department with certified statements monthly and annually showing in detail the amounts expended in the construction of the facilities during the preceding month or year, and also a final cost statement upon completion of the facilities. The taxpayer was to receive no profit from the construction of such facilities. There was to be included in the reimbursable cost the interest paid by the taxpayer on funds borrowed by it for use in performance of the contract. But the taxpayer was to give the Government the benefit of all trade discounts and allowances available to the taxpayer in the purchase of materials, and where practical it was to buy materials upon competitive bids. After receipt of the final cost certificate the Government was to reimburse the taxpayer in equal payments over a period of sixty consecutive months beginning with the month after the completion of the plant facilities.

If the taxpayer assigned its claim for reimbursement in order to obtain funds to perform the contract, the payments to be made by the Government to the assignee under the contract were not to be subject to reduction or set off for any indebtedness of the taxpayer to the United States arising independently of the contract.

In the event the contract was terminated prior to completion of the facilities, the Government was to reimburse the taxpayer to the extent of its costs up to that time, including liability to subcontractors. Upon termination of the contract the taxpayer was to have the right to choose "to retain * * * (the facilities) for its own use outright, free of any interest of the (Navy) Department" provided it paid to the Department the cost thereof less the loss in value due to damage, scrapping of equipment, depreciation, obsolescence, etc., the rates of depreciation to be fixed by the Navy Compensation Board; or, if the taxpayer were unwilling to pay such depreciated cost to retain the property, it could negotiate with the Navy Department to pay it a lesser sum representing fair value. Upon payment by the taxpayer to the Navy of the amount agreed upon, the contract provided that any and all interest of the Department in the facilities "shall forthwith terminate, and the Department

shall execute and deliver to the Contractor a valid release of any and all such interest and right."

If the taxpayer did not choose to retain the facilities by paying to the Government the depreciated cost or negotiated fair value, it was to "transfer the same promptly to the Government" free and clear of all mortgages and liens and the Government was to remove the facilities from the taxpayer's premises. The taxpayer could however still negotiate for leasing all or part of the facilities from the Government with an option to purchase them. Or, if the taxpayer did not choose to purchase or lease the facilities, did not require the Government to remove them and did not remove them himself at the Government's expense, the contractor still had the right to use them until the Government did remove them.

Upon transfer of the facilities to the Government, the Government had the right to require the taxpayer at the Government's expense to maintain and preserve the facilities for such period of time up to five years as the Secretary of the Navy might require in the interests of national defense.

In the event of destruction of the facilities the Government could require the taxpayer to apply the insurance proceeds to their restoration or replacement. The Government was then to reimburse the taxpayer for any excess cost; but the taxpayer was to return any excess insurance proceeds to the Government.

The taxpayer was to inventory separately every item of equipment, machinery and tools covered by the contract, to give a copy to the Government, and to mark each piece or unit so as readily to identify it as having been constructed or acquired under the contract.

While the facilities were in its possession during the term of the contract, the taxpayer was responsible for their care and maintenance, and the Government was to notify taxpayer at the end of each year as to the respects in which the taxpayer failed to satisfy it with regard to maintenance. Items which became obsolete or no longer useful could, after approval of the Navy Department, be sold, and the proceeds of the salvage either applied to the unpaid balance of reimbursements due from the Government or repaid to the Government.

Only upon approval of the Secretary of the Navy and upon terms satisfactory to him was the taxpayer authorized to sell or lease part of the emergency plant facilities, and the consideration was to be applied on any balance of reimbursements due from the Government or to be paid over to the Government.

Priority of use of the emergency facilities was to be given contracts or orders from or for the Government. The taxpayer also agreed that no part of the price of any of the taxpayer's products sold directly or indirectly to the Government would include in any part the cost, amortization, or depreciation of the emergency facilities. The taxpayer was to keep adequate records and accounts of all costs in connection with the construction and maintenance of the facilities. And it was to give representatives of the Department access at all times to the premises, work, materials, books and records. The taxpayer was also required to furnish the Government with such information and reports as might be necessary for expediting the national defense.

The taxpayer was authorized to assign all or part of its claims for moneys to become due under the contract to any bank or other financing institution, which was then permitted further to assign them. The assignee then was to file written notice of the assignment with the General Accounting Office and the Navy Department. The assignee could then be protected by an agreement effective under the contract that so long as any sums were due from the Government to the contractor under the contract, the taxpayer would not, without the assignee's consent, acquire the Government's interest in the facilities or make any sale or lease of them. If the taxpayer permitted a mortgage or lien to become an encumbrance upon the property in violation of the contract, the Government agreed not to withhold reimburse-

ments to the assignee in excess of the debt secured by the mortgage or lien.

The agreement also required the taxpayer to furnish to the Government a report of a title company or other evidence showing clear title to the emergency plant facilities without mortgage or liens, upon completion of the facilities, and once a year thereafter.

Article X of the contract provided as follows:

"Article X—Tax Amortization. Inasmuch as it is the intent of Sections 23 and 124 of the Internal Revenue Code [26 U.S. C.A. §§ 23, 124], unless payments made on account of Government Reimbursements for Plant Costs are included in gross income, not to allow (1) the tax deduction for amortization over a 60-month period of the Emergency Plant Facilities or (2) the inclusion of such payments in invested capital for purposes of the excess-profits tax, the Contractor agrees that, if such payments, to the extent they constitute reimbursements for capital expenditures made in acquisition or construction of such Emergency Plant Facilities, are not includible in gross income, then, for Federal tax purposes, (1) the basis of such Emergency Plant Facilities shall be computed without taking into account capital expenditures for which the Contractor has been or will be so reimbursed and (2) the amount of such reimbursements shall not be treated as paid-in surplus or contributions to capital for purposes of the excess-profits tax. In the event that the Contractor makes application to the Advisory Commission to the Council of National Defense and to the Department of the Navy for a certificate with respect to terms contained in this contract, or the necessity for any item or group of items of the Emergency Plant Facilities, acquired, constructed or installed subsequent to June 10, 1940, under Sections 23 and 124 of the Internal Revenue Code in accordance with rules governing such applications and the Contractor is thereafter refused the issuance of such certificate by either such Commission or the Department of the Navy, this contract shall terminate forthwith with the same effect as though a termination notice had been filed pursuant to Section 1 of Article 111 hereof."

On February 9, 1942, the contract was increased from the estimated amount of $2,500,000 to $3,090,000. But on January 21, 1943, the contract was further amended to allow the sixty monthly reimbursements to begin on August 31, 1942, for such facilities as were completed by July 31, 1942, the remainder to be treated separately.

To finance the construction of the plant facilities the taxpayer borrowed funds from the Pennsylvania Company for Insurance on Lives and Granting annuities, assigning to it under date of May 6, 1942, all claims for moneys due or to become due the taxpayer under the contract, as amended. The assignee duly filed written notice of such assignment with the Government, and the Government, pursuant to such notice, thereafter paid all claims for such moneys to the assignee.

Effective March 18, 1946, the contract was terminated by the Navy Department. A supplemental agreement was then executed on December 24, 1947. It recited that as a result of the termination the Government had made total payments to the assignee up to that date of $2,500,225.-81, leaving an unpaid balance of Government reimbursements for plant costs of $461,741.63. It stated that as a result of negotiations the fair value of the portion of the facilities which the taxpayer wished to retain was $525,498.74. Therefore, in consideration for the payment by the taxpayer to the Government of $525,-498.74, of which $63,757.11 was paid in cash and $461,741.63 was paid by accelerating and offsetting the remaining reimbursements which were to have been made in future month, the Government released and quitclaimed to the taxpayer all its interest and right in the facilities the taxpayer chose to retain. And the taxpayer transferred to the Government all the remaining facilities.

During 1942 the taxpayer received from the Government five monthly installments of reimbursement totaling $164,018.73, on account of the emergency plant facilities completed July 31, 1942. In its income

and excess-profits tax returns for that year in computing its taxable net income, it included that sum and deducted the same amount for amortization of the cost of the facilities. And, thus, it paid no tax on the reimbursements.

On November 8, 1945, Congress terminated the excess-profits tax as of the end of 1945. Revenue Act of 1945, 59 Stat. 556, c. 453, § 122(a), 26 U.S.C.A.Int.Rev. Acts, page 573.

On March 26, 1946, the taxpayer filed with the Collector of Internal Revenue at Philadelphia an Application for Tentative Adjustment with Respect to Amortization Deduction. This document stated that under authority of a Presidential Proclamation the taxpayer elected to terminate and accelerate the period for amortization of the emergency plant facilities completed July 31, 1942, so that their cost would be completely amortized by September 30, 1945, a period of thirty-eight months from completion of the facilities. As a result of this adjustment taxpayer claimed that its 1942 amortization deduction for the plant facilities mentioned should not be merely sufficient to offset the five installments of reimbursements it received but should be increased from $164,018.73 to $258,976.95, and that its 1942 income and excess-profits taxes should be decreased accordingly and refund made. Adjustment was likewise requested for the ensuing taxable years not involved in this action.

After examination of this Application by a revenue agent, and as a result thereof, the Commissioner of Internal Revenue allowed over-assessment of 1942 declared value excess-profits taxes and excess-profits taxes. Thereafter, in pursuance of this over-assessment there was paid to the taxpayer between July 31, 1946, and February 10, 1947, checks totalling $75,879.72 as refunds of its 1942 taxes and interest thereon. Upon further examination of the taxpayer's file, the Commissioner determined that the refunds were erroneously made. At his request this action was brought on July 27, 1948, for recovery of the erroneous refunds.

The determination of the issues involved in the motions depend upon the construction of Section 124 of the Internal Revenue Code (Appendix), and the contract between the taxpayer and the Navy Department. If the Government is correct in its interpretation of either the statute or the contract, it is entitled to recover the amount claimed.

Section 124 of the Internal Revenue Code permits the acceleration of depreciation for new defense plants; it contains three major provisions designed to make the depreciation deduction for newly expanded armament manufacturers more equitably reflect the return of capital contained in their defense profits. Section 124(a) and (e) estimated the probable duration of the emergency at five years, and allowed corporate taxpayers, who built emergency facilities, certified as essential by the National Defense Advisory Commission,[1] the Secretary of War or the Secretary of Navy, deductions with respect to the amortization of the adjusted basis of an emergency facility based on a period of sixty months from completion, but, if at an earlier date than the sixty months, the President proclaimed the termination of the emergency, or if the Secretary of War or the Secretary of the Navy certified that a particular emergency facility ceased to be necessary in the interest of national defense, then, under Section 124(d) the taxpayer could regard its facility as having lost its value over a shorter period than sixty months and revise its tax return for the period by taking larger deductions from gross income on the theory that a larger portion of the gross income was actually its capital investment returned in the shorter period. In addition, Section 124(h) provided that where a contract with the United States involving the use of a facility was terminated or cancelled, or where the taxpayer had reasonable grounds to anticipate future Government supply contracts which did not materialize, and the Government made a lump sum payment to the taxpayer, as compensation for the amortized cost of its emergency facility, which

---

1. The Commission was stricken out as a certifying agency by Joint Resolution of October 30, 1941, c. 464, 55 Stat. 757, § 1.

payment was properly includible in income, then the taxpayer could deduct for that year the entire amount of such payment to the extent that it did not exceed the remaining unamortized basis of the facility.

I have no doubt that the taxpayer was entitled to offset the sixty reimbursements it received with equivalent portions of the sum laid out in building the plant, if it included the reimbursements in computing its income. For this purpose the taxpayer need not have relied on Section 124. Whether the reimbursements were considered the return of an advance made by the taxpayer to the Government, or the price of a plant acquired by the taxpayer for sale to the Government in sixty installments, the taxpayer nevertheless owed no tax on the reimbursements unless it made a gain on the transaction. Thus, if it included in income what it had received, it was entitled to offset it with what it had laid out. This is fundamental to the income tax law which taxes only gains and not the return of capital. Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143. In this sense the taxpayer may be considered to have been entitled to amortize a capital investment against reimbursements or installments of the selling price it received, if it included what it received in computing its income.

But the question to be decided in this case is, not whether the taxpayer was entitled to amortize the cost of a transaction involving a capital asset against reimbursements or installments of selling price, but is, whether, despite the reimbursements or installments of selling price, the taxpayer was still entitled to amortize the cost of the capital asset against the income from its entire operations as if it were not otherwise recovering such cost. The taxpayer claims that Section 124 unconditionally permitted it to write off the entire cost of the emergency plant against the profits it earned during the emergency period, which would otherwise be taxed at rates effective for wartime income under the excess-profits tax laws. The taxpayer built the plant only on condition that it be expressly reimbursed for it, it had no cost and was not in a position to sustain a loss either due to wear and tear or the termination of the emergency, and, therefore, it was not entitled to the deductions from gross income provided in Section 124. Even if, in the special circumstances of the contract the section could be interpreted to furnish additional statutory authority for the sixty offsets to the sixty reimbursements where the taxpayer included them in its gross income, nevertheless Subsection 124(d) could not be construed to authorize larger deductions offsetting income other than the reimbursements, merely because the emergency ended sooner than the sixty months.

Congress obviously enacted Section 124 (a) as a part of the income tax law, and it intended that the section be read in a manner which would enable the determination of taxable net income. The section must, therefore, be read in the light of the well-understood concepts and restrictions which have been read into other sections of the Internal Revenue Code permitting deductions in similar broad language. In other words, Congress intended to grant allowance for an estimated expense only to one who had incurred it.

The legislative history of the section so indicates. When the legislation was first considered in 1940, members of the National Defense Advisory Commission, the Secretary of War, the Assistant Secretary of the Navy, the Assistant Secretary of the Treasury, and other Government officers who sponsored it, appeared at Congressional Committee Hearings in support of the measure. These Government officers explained that the purpose of the bill was to provide for "accelerated depreciation", and to allow the shortening of the depreciation period for new defense plants so that taxpayers putting their capital in emergency facilities could claim allowances for the depreciation of the facilities over the expected period of the emergency rather than over the expected physical lives of the plants. The following colloquy between Congressman McCormack and Secretary of War Stimson is a representative example of the testimony of the Government officers

who appeared to explain the need for the bill:

"Mr. McCormack. What amortization really is, is accelerated depreciation.

"Secretary Stimson. Accelerated depreciation; yes.

"Mr. McCormack. Because we have a basic policy in tax matters of allowing reasonable depreciation, except to cover emergencies where you have a program such as this, where expansion is necessary and that reasonable depreciation would have to be accelerated over what ordinary business activities would justify in normal times.

"Secretary Stimson. If a man is obliged to build a factory which he can only use in the emergency, such as we are now in, and is only allowed the amortization over a period, we will say, of 20 years, then if the emergency ceases in 3 or 4 or 5 years he is in trouble."

In no instance was it ever suggested that a taxpayer should obtain tax advantage, or allowances for the amortization of property, to which it did not bear that relationship which would entitle it to depreciation allowances, and the emphasis was always placed on the need to encourage the use of *private capital* by preventing the taxing of profits which contained a return of capital.

At the conclusion of the hearings the House Ways and Means Committee explained the need of the legislation in a report which stated in part (H.Rep.No. 2894, 76th Cong., 3d Sess., pp. 16-17, 1940-2 Cum.Bull. 496, 507-508):

"Your committee has been informed by the Advisory Commission to the Council of National Defense that substantial amounts of private capital will not be invested in the construction of such facilities unless corporations are assured, in view of the fact that such facilities will be of use chiefly only during the period of national emergency, that they will be permitted to amortize the cost thereof over a shorter period than would be permitted under the depreciation provisions of the Internal Revenue Code.

"Under the bill, accordingly, a corporation is allowed a deduction for income and excess-profits tax purposes for the amortization of certain facilities which are certified by the Advisory Commission to the Council of National Defense and either the Secretary of War or the Secretary of the Navy as necessary in the interest of national defense during the present emergency. * * *"

On the floor of the House, Representative Boehne, a member of the Ways and Means Committee, likewise explained the bill as a plan for merely making more definite the period for depreciation for specialized defense plants useful only during the period of the emergency, the depreciation of which was an actual expense of a manufacturer; that the measure was necessary to encourage the investment of private capital in them, and that a manufacturer could gain no bonus, bounty or windfall from it. He stated that the amortization deduction was necessary to determine "true net income" because the loss in value of a new defense plant, over the period of emergency, should properly be an allowable operating expense, which must be deducted before fair taxable net income would be determined. 86 Cong.Record, Part 10, pp. 11239-11240.

I am satisfied that Congress intended that the requirements for taking amortization allowances should be consistent with those used for depreciation. Section 124 (a) provides that the deduction shall be for the amortization of "the adjusted basis (for determining gain)", the same basis which the law provides for the depreciation allowance. See Internal Revenue Code, Sections 23(n) and 114(a), 26 U.S.C.A. §§ 23(n), 114(a). Section 124(c) gives a taxpayer an election to discontinue taking amortization deductions, and return to the normal depreciation allowances, with respect to the remaining basis of the same property; Section 124(g) permits depreciation allowances on such portions of a facility for which no certificate of necessity has been issued, all on the implicit assumption that the taxpayer who is entitled to amortization allowances on a particular

property is necessarily one who is entitled to depreciation allowances on the property.

It is quite clear that the taxpayer would not have been entitled to an allowance for depreciation of the emergency plant facility under the Internal Revenue Code. Section 23(*l*) of the Code, the depreciation section, which is also drawn in very broad terms, authorizes deduction from gross income of "A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)— (1) of property used in the trade or business, * * *". However, the courts have generally held that a taxpayer is not allowed the deduction unless: (1) the taxpayer claiming the depreciation allowance has a substantial proprietary interest or capital investment in the property; (2) the costs of the property for which the allowance is claimed has been borne by the taxpayer; and (3) the taxpayer has borne the burden of the loss from the depreciation for which the allowance is claimed. Detroit Edison Co. v. Commissioner, 319 U.S. 98, 101, 63 S.Ct. 902, 87 L.Ed. 1286; Weiss v. Wiener, 279 U.S. 333, 49 S.Ct. 337, 73 L.Ed. 720; Helvering v. Lazarus & Co., 308 U.S. 252, 254, 60 S.Ct. 209, 84 L.Ed. 226; Commissioner v. Revere Land Co., 3 Cir., 169 F. 2d 469, 475, 476. These restrictions are based upon the understanding that the depreciation allowance is nothing more than the deduction of an estimated *expense incurred by a taxpayer* and reflects the consumption of the capital assets earning the income. By deducting it from gross income a taxpayer sets aside that portion of his receipts which merely returns the capital used up by him, before he is compelled to pay a tax on the remainder. United States v. Ludey, 274 U.S. 295, 300, 47 S.Ct. 608, 71 L.Ed. 1054.

To say that the taxpayer should be entitled to write off the costs of the plant against its gross income because it initially laid out the funds to build it is not consistent with the fundamental purpose of any deduction for depreciation or amortization. Under the circumstances here involved, the fact that the taxpayer had laid out the funds initially still would not make the consumption, wearing out or decrease in value *its* expense rather than that of the Government. See Atlantic Coast Line R. Co. v. Commissioner, 4 Cir., 81 F.2d 309, certiorari denied, 298 U.S. 656, 56 S.Ct. 676, 80 L.Ed. 1382; Commissioner of Internal Revenue v. Terre Haute Electric Co., 7 Cir., 67 F.2d 697, certiorari denied, 292 U.S. 624, 54 S.Ct. 629, 78 L.Ed. 1479; Trojan Powder Co. v. United States, 13 F.Supp. 61, 82 Ct.Cl. 312, certiorari denied 298 U.S. 674, 56 S.Ct. 937, 80 L.Ed. 1396; A. J. Tower Co. v. Commissioner, 1 Cir., 38 F.2d 618; American Propeller & Mfg. Co. v. United States, 14 F.Supp. 168, 83 Ct.Cl. 100, reversed on another issue 300 U.S. 475, 57 S.Ct. 521, 81 L.Ed. 751; Ken-Rad Tube & Lamp Corp. v. Commissioner, 10 T.C. 1217.

[3] Under all the circumstances, I am convinced that the allowance deductible from gross income for writing off a defense plant is fundamentally based upon the same theory as is the allowance for writing off any other kind of plant. No taxpayer should be permitted to deduct such an allowance unless it is necessary to reflect his true income. This is unquestionably the Congressional intent in the enactment of Section 124. Ken-Rad Tube & Lamp Corp. v. Commissioner, 10 T.C. 1217.

A reading of the contract makes it apparent that the taxpayer corporation incurred no expense or loss due to any estimated consumption of the facilities or their decrease in value. Even if we regard the taxpayer as having itself, rather than the bank, laid out the money, it did so only after the Government had guaranteed to reimburse it for every dollar expended. Whether the plant became utterly worthless in one year or five years could make no difference to the taxpayer because it could lose nothing, since the Government was required to repay it in any event. While the taxpayer had title to the plant it was obviously merely a security title, intended to facilitate its borrowing the necessary construction funds initially from the bank. At the end of the term of the contract, title was to revert to the Government, and the taxpayer could obtain the

plant only by paying the Government a reasonable purchase price. If the plant were destroyed by fire, or otherwise, the taxpayer was required to rebuild it with the insurance proceeds. It had to inventory separately, and mark every item of equipment, covered by the contract, and it had to give full access to its records to the Navy Department. It was responsible to the Government for care and maintenance of the property. To the extent there were Government orders, the plant was to be devoted solely to execution of them. And the facilities could not be sold or encumbered by the taxpayer unless prior approval was obtained from the Secretary of the Navy, and even then the proceeds were to be applied to the reimbursements from the Government.

The contract contemplated, as shown by the "Whereas" provisions, that the facilities to be constructed were "to be paid for by" the Government, and it appears throughout the contract that it was the intention of the parties that normal depreciation should never be charged in connection with this plant. Thus, the contractor specifically agreed that in calculating the price of forgings produced in such facilities and sold directly, or indirectly, to the Government, that it would not include any amount, or allowance, on account of depreciation or amortization of the facility. Article X includes an express agreement that depreciation on account of this facility should not be claimed by the contractor unless the payments made on account of the Government's reimbursements are included in gross income. It is evident from the contract as a whole that it was the intention of the parties that normal depreciation of this facility should not be claimed by the defendant unless such claim was necessary to offset the inclusion of the reimbursement payments made by the Government in the gross income of the contractor. A fair construction of the contract shows that depreciation of this facility, if allowable, was to be allowed only as an offset to protect the contractor against the payment of any tax on account of the reimbursement payments; it was the purpose of the contract to protect the con-

tractor against loss. It would, however, be contrary to the purpose of the contract to permit the contractor to assert depreciation for the purpose of obtaining an advantage from the contract. On the contrary the contract was intended to prevent a taxpayer from claiming an amortization deduction which would give it any more tax advantage than an offset to the reimbursements. Article X was an additional precaution to prevent a taxpayer from claiming an amortization deduction which would give it any more tax advantage than an offset to the reimbursement. See Williston on Contracts (Revised Edition by Williston and Thompson), Volume IX, Sec. 99.

■ I must, therefore, conclude that the provision stating that it is the intent of Sections 23 and 124 that unless the reimbursements are included in gross income the taxpayer shall not be allowed amortization deductions, means that the taxpayer shall be entitled to deductions only to the extent that it had included the payments in income. Since during 1942 the taxpayer included only $164,018.72, in income, only to that extent was it entitled to the offset. And the claim for any greater allowance which provides more than an offset is in violation of the contract.

I must, therefore, grant motion of the plaintiff for summary judgment. An Order may be presented accordingly.

## APPENDIX

Internal Revenue Code: 26 U.S.C.A. § 124.

"Sec. 124. (As added by Second Revenue Act of 1940, supra, Sec. 302, and amended by Revenue Act of 1942, supra, Sec. 155, and Tax Adjustment Act of 1945, c. 340, 59 Stat. 517, Sec. 7.)

"Amortization deduction.

"(a) General Rule. Every person, at his election, shall be entitled to a deduction with respect to the amortization of the adjusted basis (for determining gain) of any emergency facility (as defined in subsection (e) ), based on a period of sixty months. Such amortization deduction shall be an

amount, with respect to each month of such period within the taxable year, equal to the adjusted basis of the facility at the end of such month divided by the number of months (including the month for which the deduction is computed) remaining in the period. Such adjusted basis at the end of the month shall be computed without regard to the amortization deduction for such month. The amortization deduction above provided with respect to any month shall, except to the extent provided in subsection (g) of this section, be in lieu of the deduction with respect to such facility for such month provided by section 23(*l*), relating to exhaustion, wear and tear, and obsolescence. The sixty-month period shall begin as to any emergency facility, at the election of the taxpayer, with the month following the month in which the facility was completed or acquired, or with the succeeding taxable year.

\* \* \* \* \* \*

"(d) Termination of amortization period.

"(1) If the President has proclaimed the ending of the emergency period (as defined in subsection (e) ), or if the Secretary of War or the Secretary of the Navy has, in accordance with regulations prescribed by the President, certified to the Commissioner that an emergency facility ceased, on the date specified in the certificate, to be necessary in the interest of national defense during the emergency period, and if the date of such proclamation or the within sixty months from the beginning of the date specified in such certificate occurs amortization period with respect to such emergency facility, then the taxpayer may elect (in accordance with paragraph (4) of this subsection) to terminate the amortization period with respect to such emergency facility as of the end of the month in which such proclamation was issued or in which occurred the date specified in such certificate, whichever is the earlier. In such case the amortization period with respect to such facility shall end with the end of such month in lieu of the end of the sixty-month period.

\* \* \* \* \* \*

"(4) The election provided in paragraph (1), (2), or (3) shall be made by filing with the Commissioner, in such manner, in such form, and within such time, as the Commissioner with the approval of the Secretary may by regulations prescribe, a statement of such election. When such election has been so made, then, under regulations prescribed by the Commissioner with the approval of the Secretary, the taxes for all taxable years, beginning with the taxable year in which the amortization period began, shall be computed in accordance with an amortization deduction computed in accordance with the method provided in subsection (a), but using (in lieu of the sixty-month period provided in such subsection) the amortization period specified in paragraph (1), (2), or (3), as the case may be.

\* \* \* \* \* \*

"(e) Definitions.

\* \* \* \* \* \*

"(2) Emergency period. As used in this section, the term 'emergency period' means the period beginning January 1, 1940, and ending on the date on which the President proclaims that the utilization of a substantial portion of the emergency facilities with respect to which certifications under subsection (f) have been made is no longer required in the interest of national defense.

\* \* \* \* \* \*

"(h) Payment by United States of unamortized cost of facility. If an amount is properly includible in the gross income of the taxpayer on account of a payment with respect to an emergency facility and such payment is certified as provided in this paragraph, then, at the election of the taxpayer in its return for the taxable year in which such amount is so includible—

"(1) The amortization deduction for the month in which such amount is so includible shall (in lieu of the amount of the deduction for such month computed under subsection (a) ) be the amount so includible, but such deduction shall not be in excess of the adjusted basis of the emergency facility as of the end of such month (computed without regard to any amortization deduction for such month). Payments referred to in this paragraph shall be payments the amounts of which are certified

under such regulations as the President may prescribe, by either the Secretary of War or the Secretary of the Navy as compensation to the taxpayer for the un-amortized cost of the emergency facility made because—

"(A) A contract with the United States involving the use of the facility has been terminated by its terms or by cancellation, or

"(B) the taxpayer had reasonable grounds (either from provisions of a contract with the United States involving the use of the facility, or from written or oral representations made under authority of the United States) for anticipating future contracts involving the use of the facility, which future contracts have not been made. * * *"