CHAPIN v. COMMISSIONER OF INTERNAL REVENUE (two cases).

Nos. 14017, 14018.

United States Court of Appeals
Eighth Circuit.

Feb. 6, 1950.

John R. Stivers, Memphis, Tenn. (Canale, Glankler, Loch & Little, and W. G. Boone, Memphis, Tenn. on the brief), for petitioners.

Harry Marselli, Sp. Asst. to Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack and Lee A. Jackson, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

WOODROUGH, Circuit Judge.

These two petitions to review decisions of the Tax Court are brought up on one record and present the single question whether the petitioning taxpayers, who are husband and wife, properly accrued the gain from the sale of their section of land containing 867 acres in the year 1943, or whether the Commissioner was right in taxing that gain to them as income for 1944. The Tax Court decided that the Commissioner did not err in holding that the gain was taxable income of 1944, its decision, together with its findings of fact being reported at 12 T.C. 235.

As is clearly shown in the Tax Court's findings, which are fully supported and are referred to to avoid useless repetition, the taxpayers were entitled to return their income for tax on the accrual basis in the calendar years 1943 and 1944. The transaction which culminated in the sale in question and the gain to the taxpayer and the settlement of seventeen families on that many mortgaged farms of their own, carved out of petitioners' 867 acre tract, was made possible and was initiated and intended to be and was carried out through the Farm Security Administration by the obtaining of seventeen loans under the Bankhead-Jones Farm Tenant Act, c. 517.-50 Stat. 522, 7 U.S.C.A. ch. 33, § 1000 et seq., enacted, i.a., "to enable persons [of designated classes] to acquire family-sized farms." The loans were not obtained and no money was received by the taxpayers for their land during the year 1943.

The taxpayers' claim that their sale of the land was "completely effected" and that their gains accrued in 1943 and were taxable in that year was rested on the form of the procedure that was followed in the transaction. The willingness of the taxpayers to sell the tract for $85 per acre was first indicated by them to representatives of the Farm Security Administration. Then the terms and conditions of a proposed sale which it was intended should be accomplished through loans to be obtained under the Bankhead-Jones Farm

Tenant Act were specified in a written option contract or offer to sell signed by the taxpayers in which one W. R. Gobbell was named as the person to whom the offer was made. Gobbell was a person who appeared to be one of the class of persons eligible to obtain a loan under the Act and he was authorized by the writing to assign interests in his right to purchase to other such persons up to the number of twenty. On December 23, 1943, Gobbell and sixteen of his assignees, who were persons belonging to the class of persons eligible to obtain loans under the Act, executed and delivered acceptances in writing of the offer of the taxpayers, and thereafter in the year 1944 they did meet the requirements under the Act and did obtain the loans and the price of the land was by those means paid to the taxpayers. The taxpayers contended before the Tax Court and here insist that those acceptances of their offer to sell consummated or "completely effected" the sale and fixed the date of the accrual of their gain and of the tax.

It was, and is, contended for the Commissioner that the acceptance of the taxpayers' offer by the seventeen apparently eligible persons in fact constituted no more than a mere executory contract which was not enough to warrant accruing the gain from the sale of the property as 1943 income.

The taxpayers' option agreement recited that the option was given to enable the buyers to obtain loans from the United States through the Secretary of Agriculture pursuant to Title 1 of the Bankhead-Jones Farm Tenant Act for the purchase of the land and contained provisions that the buyers of the property were to take possession January 1, 1945. The vendors were to pay interest on the option price of the land from the dates on which loans were closed to January 1, 1945 at the rate of 3 percent. The vendors were to pay all state and county and improvement taxes up to and including the 1944 taxes. They were to deliver a policy of mortgagee title insurance satisfactory to the government and to comply with all requirements of such title insurance company, including the furnishing of an abstract of title and continua-

tion thereof where required. They agreed to discharge all liens and to pay all expenses incident to the preparation of deeds and other evidence of title required by the government. The purchase price was to be paid at the time of recording seventeen general warranty deeds of the property which were to be delivered simultaneously and the taxpayers were not to be bound unless the entire purchase price for the tract as a whole was tendered. Loss or damage to the property by fire or other act of God was to be at the risk of the taxpayers until the deeds to the buyers had been recorded, and in the event of such loss or damage the buyers could refuse to accept the deeds or could elect to accept conveyance with equitable adjustment of the purchase price. It was also provided that the Regional Director [of the Farm Security Administration] might designate without notice to the seller a substitute buyer in place of Gobbell or any of his assignees.

The seventeen documents of acceptance of the taxpayers' offer delivered on December 23, 1943, included a notice to the taxpayers that they were required not to commit any waste or depreciate the property in any way during the period of their occupancy. They remained in possession of the property during all or a part of 1944.

 In order to determine when the gain from the sale and the tax accrued the Commissioner properly looked at the transaction as a whole and it is clear that the seventeen persons headed by Gobbell did not actually accomplish a purchase nor did the vendor actually accomplish a sale on the date of December 23, 1943, when the acceptances were delivered. The offer to sell was, as shown on its face, a first step and the acceptances were a second step towards enabling the parties to obtain government loans. They were the formalities antecedent to the real matter of substance, the obtaining of the loans on which the whole sale transaction was entirely dependent.

No loans had been obtained by any one of the acceptors of the offer to buy, and whether any of them would obtain a loan was so far in doubt that provision had to

be and was made in the option contract for substitution of other persons as buyers in case those who signed the papers could not or did not obtain loans and fulfill the obligations they undertook. There were only eight days in the year 1943 after the acceptances on December 23d, and it is clear that there was no possibility or expectation that the numerous requirements to be met on both sides could be satisfied in that short space of time. On the contrary, there is no proof that any other step was taken in that year along the road of action by government agencies and by the prospective settlers that had to be traveled to reach the purchase and sale that was the object of the transaction.

We think the determination of the Commissioner that taxable gain or income from the uncompleted sale in the year 1943 did not accrue during that year and that the gain and income therefrom accrued in 1944, is fully supported by the decision of the Supreme Court in Lucas v. North Texas Lumber Company, 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668.

It has been argued for the taxpayers that the Tax Court erred in its conclusions in respect to the uncertainty at the date of the acceptances concerning the amount of expenses to become thereafter chargeable to the taxpayers. The taxpayers agreed in the option contract that they would bear such charges and it certainly could not be and was not known in 1943 what they would amount to. The fact that the taxpayers were able to and did make a close approximation of them in their income tax return in March of the following year in no way disproved the Tax Court's conclusions that the amount remained undetermined and uncertain in 1943. Such uncertainty was a circumstance relevant to the issue as to the date of the accrual of the gain and of the tax. But we are convinced that the facts proven support the tax in accord with the determination of the Commissioner and as the Tax Court so decided, its decision is affirmed in both the cases.

Affirmed.