**LAKE ERIE ENGINEERING CORPO-RATION, Plaintiff,**

v.

**George T. McGOWAN, Collector of Internal Revenue, Defendant.**

Civ. A. 5168, 5247, 5382.

United States District Court
W. D. New York.
March 29, 1957.

Penney, Penney & Buerger, Buffalo, N. Y. (Alfred A. Buerger, Paul J. Woodman, Buffalo, N. Y., of counsel), for plaintiff.

John O. Henderson, U. S. Atty. (Neil R. Farmelo, Buffalo, N. Y., Philip R. Miller, Washington, D. C., of counsel), for defendant.

MORGAN, District Judge.

The above civil actions were brought by the Lake Erie Engineering Corporation against the Collector of Internal Revenue for refund of excess profits taxes paid for the years 1942 through 1945 inclusive, in the total sum of $334,384.21.

The above actions were properly brought in this District Court and submitted on stipulation after extensive pretrial conferences.

The plaintiff, Lake Erie Engineering Corporation (hereinafter called Lake Erie, the taxpayer or the contractor), is a corporation existing under the laws of New York State, with its principal place of business in the Town of Tonawanda, New York. At all times prior to 1942, the plaintiff has used the accrual basis and the calendar year for Federal income tax purposes.

On or about May 28, 1942, the Navy Department entered into a contract with Lake Erie hereinafter called "Contract NORD(F)–1126" and entitled "Contract for the Acquisition and Installation of Special Additional Plant Equipment and Facilities Required to Expedite the National War Effort." That Contract was modified by mutual agreement of the Navy Department and Lake Erie by change letters 1 and 2 and marked Exhibits 2 and 3. The total contract price was $714,718.25, out of which sum $644,192.85, Schedule A items 1–16 was certified by the Secretary of the Navy through Navy Department Certificates of Necessity Nos. ND–N–7535 and NSD–N–7333, as emergency facilities necessary in the interest of national defense. Items 17 through 20 of Schedule A totalling $70,525.40 were not certified as emergency facilities because Lake Erie did not apply to the Navy Department for Certificates of Necessity therefor within the time required by the Internal Revenue Code (1939) section 124(f), 26 U.S.C.A. § 124 (f).

The contract between Lake Erie and the Navy Department stated that the taxpayer had separately agreed to supply manufacturing equipment for prime contractors with the Government and that it was necessary for the taxpayer to acquire or construct additional emergency plant facilities for use in production un-

der the supply contract. The taxpayer agreed that it would not include in the price of the supplies any amount or allowance for the cost of acquisition, construction or installation or for the amortization or depreciation of the Emergency Plant Facilities. In return, the Navy Department agreed to reimburse the taxpayer the sum total of $714,718.25. The title to all Emergency Plant Facilities was in the taxpayer, but the taxpayer could not place a mortgage, except a mortgage as additional security to an assignee of the taxpayer's claim against the government under the contract, and even then, such mortgage or lien must be subordinate to the rights of the government hereunder. The taxpayer could make no conveyance or transfer of title to such facilities, or of any item thereof, except with the written consent thereto of the Secretary of the Navy. All mechanics liens, tax liens, attachments and other charges incurred in the ordinary course of business against the said facilities were to be promptly removed by the taxpayer, who was required to carry sufficient fire insurance to cover the cost of the facilities until the said facilities were transferred to the government.

On December 28, 1942, taxpayer assigned to the Marine Trust Company of Buffalo all moneys due and to become due under the contract, with the notice of assignment being received by the Navy Department on December 31, 1942. The Navy Department could, by written notice, terminate this contract at any time by giving a "Termination Notice." The Contract provided also, "If, during any ninety (90) day period * * * after the completion of the acquisition, construction and installation of the Emergency Plant Facilities, the same are not used to a substantial extent by the contractor for furnishing supplies to the Government * * * and if substantial use of the Emergency Plant Facilities is no longer required for any such purpose * * * the contractor may give a similar termination notice to the Department of the Navy." Under the Contract, Lake Erie could retain for its sole use any of the Emergency Plant Facilities by giving a written Notice of Retention within ninety (90) days after the giving of the Termination Notice by either Lake Erie or the Navy Department and upon the payment to the Navy of an amount equal in cost as established by the final Cost Certificate.

Tax amortization under NORD(F)–1126 was provided for by Article X, as follows:

"Inasmuch as it is the intent of Sections 23 and 124 of the Internal Revenue Code, unless payments made on account of Government Reimbursements for Plant Costs are included in gross income, not to allow (1) the tax deduction for amortization over a 60-month period of the Emergency Plant Facilities or (2) the inclusion of such payments in invested capital for purposes of the excess-profits tax, the Contractor agrees that, if such payments to the extent they constitute reimbursements for capital expenditures made in acquisition or construction of such Emergency Plant Facilities, are not includible in gross income, then, for Federal tax purposes, (1) the basis of such Emergency Plant Facilities shall be computed without taking into account capital expenditures for which the Contractor has been or will be so reimbursed and (2) the amount of such reimbursements shall not be treated as paid-in surplus or contributions to capital for purposes of the excess-profits tax. In the event that the Contractor makes application to the Secretary of the Navy for certification that the interest of the United States is adequately protected with reference to the future use and disposition of such Emergency Plant Facilities, or of the necessity for any item or group of items of the Emergency Plant Facilities, acquired, constructed or installed subsequent to June 10, 1940, under Sections 23 and 124 of the Internal Revenue Code in accordance with rules governing such applications and the Contractor is thereafter refused the issuance of such certificate by the Secretary of the Navy, this contract shall terminate forthwith with the same effect as though a

termination notice had been filed pursuant to Section 1 of Article III hereof."

On November 24, 1945, taxpayer duly filed with the Commissioner of Internal Revenue a statement of its election under Section 124(d) of the Internal Revenue Code to terminate the amortization period in respect to all its emergency facilities certified as such by Certificate of Necessity on September 30, 1945 and to compute its amortization on the shortened period.

On December 21st, 1945, the taxpayer gave to the Navy a "Termination Notice" (Exhibit 4) in accordance with Article III, Section 1(b) of the Contract. At the same time, taxpayer gave "Notice of Non-Retention of Emergency Plant Facilities" (Exhibit 5) and thereby waived and discharged and agreed to waive and discharge any right to give any "Retention Notice" under Article III, Section 2 of the Contract.

On May 29, 1946, Lake Erie duly mailed and there was thereafter duly delivered to the Navy Department a letter, a "Transfer of Emergency Plant Facilities" and a "Contractor's invoice, Exhibits 7, 8, 9. Prior to May 29, 1946, the Government had made thirty-one (31) monthly payments to the Marine Trust Company totalling $371,700.16, and still owed the taxpayer or its assignee $343,018.09. The total payments received by Marine Trust Company during 1946, including the final lump sum payment of $343,018.09 amounted to $390,330.93.

In its excess profits tax return for 1942, 1943 and 1944, the taxpayer neither included in income the reimbursement made by the Government under the contract, nor deducted from income allowances for amortization of the amounts laid out pursuant to Article X of the said contract.

When the termination and non-retention notice was given to the Navy Department on December 21, 1945, the right of the taxpayer became fixed. The Navy Department became obligated to pay the entire unpaid balance. The record shows no dispute as to the Government's liability; with the amount not being subject to set-off or reduction. Unlike an ordinary sales contract, the Government already had substantial attributes of ownership in the facilities, the title to which the taxpayer was required to transfer to it. The taxpayer could not withdraw or sell the facilities to anyone else. The Government, on the other hand, could not withdraw from the contract, nor refuse to make payment, or refuse to accept the title. The tender of the bill of sale was a mere formality which was wholly within the taxpayer's control.

The taxpayer needed to draft a two page Bill of Sale and a one page Contractor's Invoice. Lake Erie became entitled to the payment of the remaining sum of $390,330.93 in 1945 when it gave to the Government the Notice of Termination and Non-Retention on December 21, 1945. Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 52 S.Ct. 529, 286 U.S. 290; Commissioner of Internal Revenue v. North Jersey Title Ins. Co., Inc., 3 Cir., 79 F.2d 492, 493; Commissioner of Internal Revenue v. Dumari Textile, 2 Cir., 142 F.2d 897. The cases cited by the taxpayer can be distinguished in that they speak of an executory contract of sale, Lucas v. North Texas Lumber Co., 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668; United States v. Harmon, 10 Cir., 205 F.2d 919; Chapin v. Commissioner, 8 Cir., 180 F.2d 140, not present in the instant case.

A further ground for holding that the payment of $390,330.93 by the Government accrued in 1945 is Sec. 29.42–1 (now 39.42–1) of Treasury Regulation, which provided in part that "In the case of a termination of a war contract, as defined by sec. 3 of the Contract Settlement Act of 1944 (or the termination of any other government contract as to which the right to compensation is definitely fixed and the measure thereof is determinable with reasonable accuracy), if the return is rendered on a basis other than cash receipts and disbursements, compensation for the termination shall, unless a different method of reporting is

prescribed or approved by the Commissioner, constitute income for the taxable year in which falls the effective date of the termination, except that if any part of the compensation is attributable to cost, expenses, or losses incurred in a subsequent year, such part of the compensation shall be returned as income for the subsequent year." Breeze Corporation v. United States, 117 F.Supp. 404, 127 Ct.Cl. 261.

Lake Erie must show that the consumption, wearing out, or decrease in the value of the emergency facility was *its expense* rather than that of the government. Trojan Powder Co. v. U. S., 13 F.Supp. 61, 82 Ct.Cl. 312, certiorari denied 298 U.S. 674, 56 S.Ct. 937, 80 L.Ed. 1396; Atlantic Coast Line R. Co. v. Commissioner, 4 Cir., 81 F.2d 309, certiorari denied 298 U.S. 656, 56 S.Ct. 676, 80 L.Ed. 1382; Detroit Edison Co. v. Commissioner, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286; Weiss v. Wiener, 279 U. S. 33, 49 S.Ct. 337, 73 L.Ed. 720; Commissioner of Internal Revenue v. Revere Land Co., 3 Cir., 169 F.2d 469; Helvering v. Lazarus & Co., 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226.

In a similar case under an identical contract in United States v. Milnor Corp., D.C., 85 F.Supp. 931, at page 936, the court said, "Thus if it included in income what it had received, it was entitled to offset it with what it had laid out * * But the question to be decided in this case is, not whether the taxpayer was entitled to amortize the cost of a transaction involving a capital asset against reimbursements or installments of selling price, but is, whether, despite the reimbursements or installments of selling price, the taxpayer was still entitled to amortize the cost of the capital asset against the income from its entire operation or if it were not otherwise recovering such cost. The taxpayer claims that Section 124 unconditionally permitted it to write off the entire cost of the emergency plant against the profits it earned during the emergency period which would otherwise be taxed at rates effective for wartime income under the excess-profits tax laws. The taxpayer built the plant only on condition that it be expressly reimbursed for it, it had no cost and was not in a position to sustain a loss either due to wear and tear or the termination of the emergency, and, therefore, it was not entitled to the deduction from gross income provided in Section 124 * * * nevertheless Subsection 124(d) could not be construed to authorize larger deductions offsetting income other than the reimbursements merely because the emergency ended sooner than the sixty months." Article X of the contract NORD(F)–1126 confirms this reasoning. In all the Congressional hearings and debates on Sec. 124, amortization was spelled out as "accelerated depreciation." Congress intended that the requirements for the taking of amortization allowances should be consistent with the standards for depreciation. Commissioner of Internal Revenue v. Harriman Ripley & Co., Inc., 3 Cir., 202 F.2d 280, affirming Cramp Shipbuilding v. Commissioner, 1950, 14 T.C. 33, so heavily relied on by Lake Erie can be distinguished because of the closing agreement.

Lake Erie argues that both the United States v. Milnor Corp., supra, and the Avco Mfg. Co. v. Commissioner, 25 T.C. 975 have lost their efficacy because they relied in part on Ken-Rad Tube & Lamp Corp. v. Commissioner, 6 Cir., 180 F.2d 940. However, the applicability of Sec. 124 was not disputed. The Ken Rad case was decided on the question that the statute contained no limitation requiring the taxpayer to own the property at the end of the emergency period. This reasoning was approved in Commissioner of Internal Revenue v. Ambrose, 2 Cir., 204 F.2d 796.

It would be a violation of the contract NORD(F)–1126 to grant amortization, depreciation and abandonment allowances to Lake Erie in excess of the reimbursements received in 1943 and 1944 and 1945, which latter year included the accrual of the unpaid balance under the said contract. Lake Erie is likewise not

entitled to an amortization deduction for the year 1942.[1]

The complaints of Lake Erie Engineering Corporation are hereby dismissed. Present order accordingly.

[1.] Lake Erie received refunds for the years 1943, 1944 and 1945 totalling $228,024.-91 including accrued interest, but at the same time was assessed a deficiency of $112,957.46 for the year 1945, leaving a balance of $115,067.45 which Lake Erie had received following the recomputation of its tax liability by the Commissioner of Internal Revenue for the years in dispute, Exhibits 15, 16, 17, 18, 19, 24.