**LAKE ERIE ENGINEERING CORPO-RATION, Plaintiff-Appellant,**

**v.**

**George T. McGOWAN, Collector of Internal Revenue, Defendant-Appellee.**

**Nos. 186–188, Dockets 24892–24894.**

United States Court of Appeals Second Circuit.

Argued May 6, 1959.

Decided June 22, 1959.

---

3. For an earlier appeal, see Hayslip v. Long, 5 Cir., 1955, 227 F.2d 550.

342

Alfred A. Buerger of Buerger & O'Connor, Buffalo, N. Y. (Frisbee J. Fuller, Buffalo, N. Y., on the brief), for plaintiff-appellant.

Joseph Kovner, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, Washington, D. C., and John O. Henderson, U. S. Atty., W. D. N. Y., Buffalo, N. Y., on the brief), for defendant-appellee.

Before CLARK, Chief Judge, and L. HAND and WATERMAN, Circuit Judges.

CLARK, Chief Judge.

This is an appeal from a decision of Judge Morgan, D.C.W.D.N.Y., 162 F. Supp. 176, denying the claims of Lake Erie Engineering Corporation to refunds of excess profits taxes for the years 1942 through 1945. In May 1942, to increase its capacity to produce materials essential to the war effort, Lake Erie entered into a standard "Emergency Plant Facilities" contract with the Navy Department. This contract provided that plaintiff was initially to finance and construct the needed facilities at its own expense. It was then to be reimbursed for their total cost in sixty equal monthly installments, but was to make no profit. The contract was terminable by the Navy Department at any time and by Lake Erie whenever the facilities were no longer required for the war effort. Within 90 days of termination plaintiff could elect to retain the facilities by paying the Navy Department their value or to transfer them to the Department.

On the occurrence of either event it was to receive the balance due it under the contract in a lump sum credit or payment. During the term of the contract and until one of these two events occurred, Lake Erie had title to the facilities and was required to keep them insured, in good condition, and free of all mortgages and liens not consented to by the Secretary of the Navy. Finally, the contract contemplated that the contractor might apply to the Secretary of the Navy for certificates of necessity under I.R.C. 1939, § 124, covering the facilities constructed; and it provided that the contract should terminate forthwith if such certificates were refused it.

■ Pursuant to this contract Lake Erie installed its needed facilities at a total cost of $714,718.25. It received certificates of necessity from the Secretary of the Navy only as to facilities totaling $644,192.85 in cost, however, as it failed to make timely application for certification of the remaining items.[1] In December 1945, following the ending of the emergency period by Presidential proclamation effective September 30, 1945, Lake Erie terminated the contract. With its notice of termination it also sent the Navy Department notice of its intent not to retain the contract facilities, thereby waiving its option to do so. Title to these facilities was transferred to the Department in May 1946, and shortly thereafter plaintiff's assignee received the balance of $390,330.93 due under the contract. It or its assignee has received reimbursement from the Navy Department under the contract of its entire cost as follows: $38,499.99 in 1943, $143,948.81 in 1944, $141,938.52 in 1945, and $390,330.93 in 1946. When it filed its original returns it did not in-

clude these items as income or claim deductions as to them. But later after the war emergency had ended it filed amended returns and refund claims based upon their inclusion as income, with extensive claims for deduction of accelerated depreciation of the facilities. The Commissioner of Internal Revenue agreed that the items were income to the taxpayer, but did not accept the taxpayer's claims for deductions and ruled that the item of $390,330.93 paid in 1946 actually accrued in 1945. The taxpayer paid the resulting higher taxes assessed and now sues for refund in three actions covering the different years, consolidated for trial and appeal.

The issue arises because the rates of taxation were markedly lower in 1946, when the excess profits tax was no longer in effect, than in earlier years. Thus the rate paid by the taxpayer in 1946 was 38 per cent, while in 1944 and in 1945 the rate was 85.5 per cent. To recover here the taxpayer must win acceptance for both its contentions; if it loses on either the contention that the final payment for the facilities did not accrue until 1946 or on its claim for deduction, the amount of tax then properly assessed is in excess of all refunds claimed. Since the question of time of accrual of the item of $390,330.93 presents some difficulties, as to the solution of which we are not in entire agreement,[2] we shall limit discussion to the claims for depreciation deduction, as to which we are in accord.

With reference to these claims it is to be noted that the Commissioner has allowed deductions equal to the amount returned as income from the reimbursements. As discussed below, he would limit deduction for depreciation to a

1. While its claim for amortization deduction, hereinafter discussed, originally included also the facilities for which it had not received certificates of necessity, it has abandoned that part of its claim on appeal.

2. Cases cited as supporting return in 1946 include Lucas v. North Texas Lumber Co., 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed.

668; United States v. Harmon, 10 Cir., 205 F.2d 919; and Chapin v. C. I. R., 8 Cir., 180 F.2d 140, while cases cited as supporting return in 1945 include Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 52 S.Ct. 529, 76 L. Ed. 1111; C. I. R. v. North Jersey Title Ins. Co., 3 Cir., 79 F.2d 492; and C. I. R. v. Dumari Textile Co., 2 Cir., 142 F. 2d 897.

maximum not beyond the taxpayer's investment. The taxpayer contends that the deductions are not thus limited, but may be claimed broadly against any items of income; as it puts it succinctly, "No authority requires or permits the Government to synchronize deductions with income under the contract." But this we think is an oversimplification which relies on a purely literal and forced interpretation of statutory language, at variance with natural meaning and intent.

In the long and involved provisions authorizing the acceleration of depreciation for new defense plants, the basic grant is found in the first sentence of I.R.C.1939, § 124(a): "Every person, at his election, shall be entitled to a deduction with respect to the amortization of the adjusted basis (for determining gain) of any emergency facility (as defined in subsection (e) ), based on a period of sixty months." Subsection (d) allows this same deduction to be computed on a yet shorter period if the President proclaims the ending of the emergency period earlier (as he actually did here as of September 30, 1945). An emergency facility is defined in subsection (e) (1) as one constructed or acquired after December 31, 1939, "and with respect to which a certificate under subsection (f) has been made." Also to be noted is subsection (h) providing, *inter alia*, that where a contract with the United States involving the use of a facility has been terminated or cancelled and the Government has paid a lump sum to the taxpayer, as compensation for the amortized cost of its emergency facility, which sum was properly includible in income, the taxpayer could deduct for that year the entire amount of such payment to the extent that it did not exceed the remaining unamortized basis of the facility. In point also is Article X of the contract itself, entitled Tax Amortization, and discussed below.

■■ Relying on § 124 the taxpayer makes claims for amortization deductions totaling $644,192.85 (the cost of the facilities for which it had certificates of necessity) allocated without reference to the time of receipt of reimbursement and with resulting heavy concentration in the high tax years.[3] We think the taxpayer's basic error is that it eliminates entirely the requirement that the amortization shall be not of the emergency facility itself or its costs, but of the "adjusted basis (for determining gain)" of the facility. "Adjusted basis" is defined in I.R.C.1939, §§ 113(a) and (b), as cost, adjusted for certain other factors not here involved. Hence quite clearly the adjusted basis is the actual original cost of the facility and obviously cost to the taxpayer, and not to someone else. Detroit Edison Co. v. C. I. R., 319 U.S. 98, 100, 63 S.Ct. 902, 87 L.Ed. 1286. So read the provision becomes understandable and practical. In place of the ordinary delayed depreciation of I.R.C.1939, § 23($l$), the defense contractors are allowed an accelerated depreciation of their investment; and when, as here, a taxpayer has received complete reimbursement, so that it has no investment to recapture, there is no basis for further deduction. This is in line with the legislative history as cited to us and what the courts have understood as the statutory purpose, namely, to afford protection to defense plants against sudden termination of the emergency, leaving them with a large investment in facilities that they could no longer use, but not to give them deductions more or less arbitrary in nature and not tied in with the taxpayer's own investment. See, e. g., United States v. Allen-Bradley Co., 352 U.S. 306, 77 S.Ct. 343, 1 L.Ed.2d 347; C. I. R. v. Ambrose, 2 Cir., 204 F.2d 796; Arkansas-Oklahoma Gas Co. v. C. I. R., 8 Cir., 201 F.2d 98, 102; United States v. Milnor Corp., D.C. E.D.Pa., 85 F.Supp. 931, 936–937.

Perhaps now we should discuss the Commissioner's actions in allowing the

---

3. The actual deductions claimed were $16,-480.36 for 1942, $177,880.68 for 1943, $256,514.11 for 1944, and $193,317.70 for 1945.

taxpayer a full deduction of the entire amount of reimbursements for facility costs received, even though no one here questions it. Possibly an argument could have been made that the reimbursements should have been eliminated altogether from both sides of the income tax ledger; in that event it seems clear that under Article X of the contract no deduction could have been claimed, and the question would not have arisen. But the inclusion seems natural in accordance with the usual revenue policy that all items of receipt or gain must be set forth even though offset by deductions, and hence it is assumed in the statute, see, e. g., I.R.C.1939, § 124(h), supra, and is required by the Treasury Regulations. See U.S.Treas.Reg. 111, § 29.42–1, promulgated under I.R.C.1939 and amended by T.D. 5405, 1944 Cum.Bull. 154.

The same general policy, with like consequences, seems also to be indicated in "Article X—Tax Amortization" of the contract. This is set forth in full in the opinion below, D.C.S.D.N.Y., 162 F.Supp. 176, 178, 179, and also in the analogous case of United States v. Milnor Corp., supra, D.C.E.D.Pa., 85 F.Supp. 931, 934. It provides:

> "Inasmuch as it is the intent of Sections 23 and 124 of the Internal Revenue Code, unless payments made on account of Government Reimbursements for Plant Costs are included in gross income, not to allow (1) the tax deduction for amortization over a 60-month period of the Emergency Plant Facilities * * *, the Contractor agrees that, if such payments, to the extent they constitute reimbursements for capital expenditures made in acquisition or construction of such Emergency Plant Facilities, are not includible in gross income, then, for Federal tax purposes, (1) the basis of such Emergency Plant Facilities shall be computed without taking into account capital expenditures for which the Contractor has been or will be so reimbursed * * *."

Thus it is clear that if the reimbursements are not includible in gross income then there can be no deduction involving expenditures for which the contractor will be reimbursed. This the taxpayer concedes, but finds the contract provision formally inapplicable because the reimbursements were included in gross income. Nevertheless its meaning and intent seem clear and in no wise justifying the negative opposite which the taxpayer implies. It actually carries out the general intent which we find both explicit and implicit in all the provisions we are considering, namely, that the defense contractor will be protected against loss in its investment, but will not receive an additional advantage beyond this (and beyond of course its normal business profits on its operations). Hence the Commissioner seems justified, as within the intent of the statute and the contractual provision, to allow the taxpayer the benefit of some deduction from the full taxability of the reimbursements. Both subsection (h) and the contract's Article X indicate quite clearly that the amount to be deducted is the full amount of reimbursement not beyond the taxpayer's investment. Hence the essential fairness of this step would seem not in doubt; and, as stated, it is nowhere contested.

We therefore conclude that the Commissioner was correct in refusing further deductions and that the decision below must stand. This is the conclusion followed also in the extensively reasoned case of United States v. Milnor Corp., supra, D.C.E.D.Pa., 85 F.Supp. 931, as well as in the Tax Court, Avco Mfg. Corp. v. C. I. R., 25 T.C. 975. There is no case opposed. The case of Ken-Rad Tube & Lamp Corp. v. C. I. R., 6 Cir., 180 F.2d 940, cited by plaintiff, held only that the statute contained no limitation requiring the taxpayer to own the property at the end of the emergency period. We followed this reasoning in C. I. R. v. Ambrose, supra, 2 Cir., 204 F. 2d 796.

Affirmed.